UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CLEARLINE TECHNOLOGIES LTD., | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-1420 |
| | § | |
| COOPER B-LINE, INC., et al., | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant Cooper B-Line, Inc.'s Motion for Summary Judgment ("Motion") (Doc. No. 73). After considering the parties' arguments and the applicable law, the Court finds that Cooper B-Line's Motion must be granted in part.

## I.      BACKGROUND

Plaintiff Clearline Technologies Ltd. ("Clearline")[1] brings this action against Defendant Cooper B-Line, Inc. ("Cooper B-Line")[2][3] for claims arising out of Defendants' alleged misrepresentations and infringement of Plaintiff's trademark and trade dress. Clearline's trademark and trade dress claims arise out of its C-PORT® trademark, which is used in connection with the sale of its rooftop support products. (Plaintiff's Third Amended Complaint ("Amended Complaint"), Doc. No. 67, ¶ 9.) Clearline filed an application to register this mark in November 2005, and it was registered on the United States Patent and Trademark Office's (USPTO) principal register on April 17, 2007. (*Id.*) Clearline also contends that it has acquired

---

[1] Clearline is a Canadian limited company with a principal place of business in Winnipeg, Canada. (Am. Compl. ¶ 1.)

[2] Cooper B-Line is a Delaware corporation with a principal place of business in Highland, Illinois. (*Id.* ¶ 2.)

[3] The parties agreed to the dismissal of Defendants Cooper Technologies Company (Doc. No. 32) and Cooper Industries plc (Doc. Nos. 84, 86).

protectable rights in the trade dress of the distinctive C-PORT® products, which includes "their non-functional shape, dimensions, color, and yellow striping." (*Id.* ¶ 11.)

In April 2003, Clearline entered into a Proprietary Information Agreement with Cooper B-Line, which provided that Clearline and Cooper B-Line "would evaluate and negotiate the prospect of Clearline supplying strut supports, bridge supports, and other related rooftop support products to Cooper B-Line." (*Id.* ¶ 8.)  They also reached an oral agreement that granted Cooper B-Line exclusive rights to sell Clearline's products within the United States. (*Id.*)  Clearline first sold its C-PORT® products to Cooper B-Line for distribution in the United States in December 2005, and over 70% of its C-PORT® sales were made to Cooper B-Line in 2006 and 2007. (*Id.* ¶ 10.)

In July 2007, Clearline contends that Dave Rice and Chris Peeler of Cooper B-Line represented to Clearline founder Neil Krovats that Cooper B-Line wished to enter into a contract to distribute 700,000 units of C-PORT® products over the next year; however, Clearline would need to increase its capacity first. (*Id.* ¶ 12.)  Based on that request, Clearline increased its capacity by moving to a larger facility, and expended $10,000 in legal fees to prepare a new contract for Cooper B-Line. (*Id.*)  Without warning, Dave Rice, Dave Cibula, and Chris Peeler of Cooper B-Line informed Neil Krovats in April 2008 that, effective immediately, Cooper B-Line would no longer distribute C-PORT® products for Clearline in the United States. (*Id.* ¶ 13.)

Clearline became aware that Cooper B-Line was selling confusingly similar rooftop support products under the trademark DURA-BLOK™ in July 2008. (*Id.* ¶ 14.)  Cooper Technologies Company filed the application to register the trademark on December 15, 2008, and it was registered on the USPTO's principal register on September 14, 2010. (*Id.* ¶ 15.)

Clearline asserts that the DURA-BLOK™ products have the same non-functional shape, dimensions, color, and yellow striping as the C-PORT® products, are sold through a catalogue that is virtually identical to the catalogue developed and used by Clearline, and bear product identifiers and specifications that are very similar to those of Clearline.  (*Id.* ¶ 14.)  Cooper B-Line's website advertises the DURA-BLOK™ products.  (*Id.* ¶¶ 16–17.)  Clearline also asserts that Cooper B-Line continues to use Clearline's C-PORT® mark in meta-tags[4] associated with its websites, with intent to trade on the reputation and goodwill of Clearline.  (*Id.* ¶ 21.)

Clearline's Amended Complaint contains various claims for relief labeled as Counts 1–5: (1) false designation of origin or sponsorship and trade dress infringement under 15 U.S.C. § 1125(a); (2) common law trade dress infringement; (3) violations of the Illinois Deceptive Trade Practices Act (815 ILCS 510/1 *et seq.*); (4) trademark infringement under 15 U.S.C. § 1114(a); and (5) fraud.  The Court previously granted summary judgment on the fraud claim (Doc. No. 77), but Clearline's Motion for Reconsideration (Doc. No. 93) is pending.  Cooper B-Line now moves for summary judgment on Clearline's trade dress infringement claims under the Lanham Act (Count 1), Illinois common law (Count 2), and the Illinois Deceptive Trade Practices Act (Count 3).  Cooper B-Line also moves for summary judgment on the trademark infringement claim under the Lanham Act (Count 4).

## II.    LEGAL STANDARD

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  Fed. R.

---

[4] A meta-tag is "a special HTML tag that is used to store information about a Web page but is not displayed in a Web browser. . . . Many search engines use the information stored in meta tags when they index web pages."  (Am. Compl. ¶ 21 (citing TechTerms.com, http://www.techterms.com/definition/metatag).)  Therefore, Clearline urges that "[t]he Court may reasonably infer that a consumer who uses a search engine to find Clearline's C-Port products will be directed to Cooper Industries' website, where the consumer will find support blocks that appear confusingly similar to Clearline's products."  (*Id.*)

Civ. P. 56(c).   Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).   A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.   *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).   Summary judgment also may be granted "against a party who fails to make a showing sufficient to establish the existence of any element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.   *Id.*   "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"   *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court may not make credibility determinations or weigh the evidence.   *Harvill v. Westward Communications*, L.L.C., 433 F.3d 428, 436 (5th Cir. 2005).   Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.   Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).   Additionally, any "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### III.   ANALYSIS

#### A.  Trade Dress Infringement

To prove infringement of a trade dress, a plaintiff must show (1) that the dress is protectable,[5] and (2) that infringement has occurred.  *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 425 (5th Cir. 1984), *abrogated on other grounds by TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23 (2001).  "The plaintiff has the burden of proof on both of these issues."  *CICCorp., Inc. v. AIMTech Corp.*, 32 F. Supp. 2d 425, 434 (S.D. Tex. 1998).  To be protectable under the first prong, the trade dress must be nonfunctional and either be inherently distinctive or have secondary meaning.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000).  The second prong, infringement, occurs where "the use creates a likelihood of confusion as to the 'source, affiliation, or sponsorship'" of the alleged infringer's product.  *Pebble Beach, Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 543 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices*, 532 U.S. 23 (citing 15 U.S.C. § 1125(a)(1)(A)).

#### 1.  Definition of Plaintiff's Trade Dress

First, the Court must address Clearline's articulation of its trade dress and determine which elements comprise the asserted trade dress in this case.  Cooper B-Line contends that Clearline changed and expanded the definition of its alleged trade dress after this Motion was

---

[5] Clearline argues that Cooper B-Line should "be promissorily or equitably estopped from challenging the validity or enforceability of Clearline's trade dress" because Cooper B-Line signed a Proprietary Information Agreement in which it promised to "respect the intellectual property rights of Clearline in and to . . . the product line, and . . . not challenge the validity of such intellectual property rights or Clearline's ownership of the same."  (Resp., Doc. No. 80, ¶ 3.)  Aside from mentioning the doctrines of promissory and equitable estoppel, Clearline makes no attempt to list the elements under Illinois law or show how the doctrines apply.  Rather, Clearline quotes only a case applying equitable estoppel/detrimental reliance under Louisiana law, as codified in article 1967 of the Louisiana Civil Code, but makes no attempt to show its reliance to its detriment even under the definition cited.  (Resp. ¶ 3 n.3 (quoting *19th Jud. Dis. Ct. Bldg. Com'n v. Lev. 3 Com'ns LLC*, 659 F. Supp. 2d 766, 773 (M.D. La. 2009)).)  Accordingly, the Court does not find that Cooper B-Line is estopped from challenging the validity of Clearline's trade dress.

filed and discovery closed, that this change is untimely, and that the new definition is "fatally vague." (Reply, Doc. No. 90, ¶¶ 8–17.)

In Clearline's Complaint[6], it asserts that "Clearline has also acquired trademark rights in the trade dress of the inherently distinctive C-PORT® products, in particular, their non-functional shape, dimensions, color, and yellow striping, which have developed a secondary meaning and are recognizable throughout the industry." (Am. Compl. ¶ 11.)  It provides photos of both the C-PORT® and DURA-BLOK™ products, and asserts that Cooper B-Line's "DURA-BLOK™ products . . . have the same non-functional shape, dimensions, color, and yellow striping as the C-PORT® products." (*Id.* ¶ 14.)  It also adds that "many of Defendants' products bear product identifiers and specifications that are confusingly similar to Clearline's product identifiers," providing examples of dimensions, loads, and model numbers.  (*Id.*)

In an interrogatory request, Cooper B-Line asked Clearline to "[i]dentify each specific product that is the subject of your claims, and for each specific product identified, describe the specific characteristics of that product that you contend constitute your trade dress, including, but not limited to, each shape, dimension, color, mark, or other feature." (Plaintiff's First Amended Answers to Defendant's First Set of Interrogatories, Doc. No. 90-5, at 5.)  On November 23, 2011, Clearline responded, "The characteristics of such [Cooper B-Line DURA-BLOK™] products that infringe Clearline's trade dress include, without limitation, the angle of orientation of the walls comprising the support block, the color of the support block, the yellow stripe on the long sloped sides of the support block, and the dimensions of the support block." (*Id.* at 5–6.)

On May 4, 2012, after motions for summary judgment were filed and discovery had closed, Clearline served a new answer to Interrogatory 1.  It stated, "The characteristics of such

---

[6] The relevant portions quoted here are identical across all four complaints in this case.  *See* Complaint, Doc. No. 1, ¶¶ 11, 14; First Amended Complaint, Doc. No. 17, ¶¶ 12, 15; Second Amended Complaint, Doc. No. 52, ¶¶ 11, 14.

[Cooper B-Line] products that Clearline contends constitute its trade dress are the overall look or appearance of the products, i.e., the shape, dimensions, color scheme, and yellow striping, and also the accompanying product identifiers and numbers contained in advertising and marketing material for customers."   (Plaintiff's Second Amended Answers to Defendant's First Set of Interrogatories, Doc. No. 90-6, at 5–6.)   Clearline asserts that it amended its response because it "became aware of Cooper's scheme" to "misconstrue Clearline's definition of its trade dress" when Cooper B-Line filed its Motion for Summary Judgment.   (Sur-Reply, Doc. No. 96, ¶ 6.) Accordingly, it supplemented its response "only out of an abundance of caution."  (*Id.*)  Clearline notes that the interrogatory did not ask Clearline to define its trade dress, but asked only for the characteristics of the *Cooper B-Line products* that constitute Clearline's trade dress.  (*Id.* ¶ 7.)

Other courts have opined on the prejudice that results from a plaintiff's failure to disclose specific elements of its trade dress or from last-minute changes.  As one court stated:

> Plaintiff cannot wait until after the close of discovery, indeed until filing its opposition to summary judgment, to disclose the combination of design elements that comprise its trade dress claims. Doing so deprive[s] Defendants of the opportunity to conduct discovery with respect to the specific elements of each trade dress and whether their combination has acquired secondary meaning, is nonfunctional, and is likely to be confused with Defendants' products.

*Hammerton, Inc. v. Heisterman*, 2:06-CV-00806 TS, 2008 WL 2004327, at *4 (D. Utah May 9, 2008).  *See also Mobile Shelter Sys. USA, Inc. v. Grate Pallet Solutions, LLC*, 3:10-CV-978-J-37JBT, --- F. Supp. 2d ----, 2012 WL 115601, at *7 (M.D. Fla. Jan. 14, 2012) ("The prejudice which flows from Plaintiff's last minute change in the scope of its trade dress claims is plain.")

Clearline is correct that, generally, "[t]rade dress refers to the total image and overall appearance of a product, and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." (Sur-Reply ¶ 5 (quoting Memorandum and Order, Doc. No. 48, at 7; *Amazing Spaces,*

*Inc. v. Metro Mini Storage*, 608 F.3d 225, 250–51 (5th Cir. 2010)).)  However, trade dress law's "focus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997); *see also Alpha Kappa Alpha Sorority Inc. v. Converse Inc.*, 175 Fed. Appx. 672, 680 (5th Cir. 2006) ("Nothing in our opinion today conflicts with the Second Circuit's holding in *Landscape Forms*."); *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir. 2002) ("Had the case proceeded further, Abercrombie would have been expected to list the elements of the designs and the unique combinations it sought to protect, which enumeration would have enabled the district court to craft a sufficiently specific injunction had such proved warranted.").  Where, as here, a plaintiff seeks to protect a trade dress in a line of products, the same articulation requirement "applies with equal or greater force."  *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116–17 (2d Cir. 2001)[7]; *see also Berg v. Symons*, 393 F. Supp. 2d 525, 551 (S.D. Tex. 2005).

Clearline asserts that "the basic scope of the asserted trade dress has remained consistent." (Sur-Reply ¶ 4 (quoting *Competitive Edge, Inc. v. Staples, Inc.*, 763 F. Supp. 2d

---

[7] The Second Circuit noted four reasons for this holding:

> First, without a specification of the design features that compose the trade dress, different jurors viewing the same line of products may conceive the trade dress in terms of different elements and features, so that the verdict may be based on inconsistent findings.
>
> Second, no juror can evaluate secondary meaning, overbreadth, or nonfunctionality without knowing precisely what the plaintiff is trying to protect: "[w]ithout such a precise expression of the character and scope of the claimed trade dress, ... courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market." *Landscape Forms,* 113 F.3d at 381.
>
> Third, "a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, *i.e.,* the claimant seeks protection for an unprotectible style, theme or idea." *Landscape Forms,* 113 F.3d at 381. The identification of design elements that compose the asserted trade dress will thus assist in winnowing out claims that are overbroad as a matter of law. . . .
>
> Fourth, "[c]ourts will ... be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection." *Landscape Forms,* 113 F.3d at 381.

*Yurman Design*, 262 F.3d at 116–17.  This Court agrees.

997, 1012 n.5 (N.D. Ill. 2010)).)   The first interrogatory response listed (1) "the angle of orientation of the walls comprising the support block," (2) "the color of the support block," (3) "the yellow stripe on the long sloped sides of the support block," and (4) "the dimensions of the support block."  (Plaintiff's First Amended Answers to Defendant's First Set of Interrogatories at 5–6.)   These correspond with the elements of the "overall look or appearance" that Plaintiff identified in the amended response as "the shape, dimensions, color scheme, and yellow striping."  (Plaintiff's Second Amended Answers to Defendant's First Set of Interrogatories at 5–6.)   The Court finds that the original response provides the necessary detail Clearline needs in order to successfully assert a trade dress claim, and will use the elements as defined in the original response rather than the vague references to "shape, dimensions, [and] color scheme" in the amended response.  (*Id.*)

The final portion of the amended response lists "the accompanying product identifiers and numbers contained in advertising and marketing material for customers."  (*Id.*)   While the Complaint states that "many of Defendants' products bear product identifiers and specifications that are confusingly similar to Clearline's product identifiers" and provides an example of model numbers (Am. Compl. ¶ 14), this element is not included in the definition of *trade dress* in the Complaint.  (*Id.* ¶ 11.)   Clearline does not explain why the product identifiers or model numbers were not mentioned in the original response or why this element was added, and does not contend that Cooper B-Line has been given the opportunity to conduct discovery on this element. The Court finds this element is not properly an element of Clearline's trade dress.[8]

Additionally Cooper B-Line protests that Clearline has never before identified "the overall look or appearance of the products" as constituting its trade dress in its complaints.

---

[8] Even if the model numbers were an element of the trade dress, Clearline has failed to produce any evidence of non-functionality or secondary meaning.

(Reply ¶ 14 n.4.)  However, the Court does not interpret the case law cited by Cooper B-Line to mean that a plaintiff attempting to protect the overall look of a product must use those specific words; rather, the overall appearance is the basic definition of trade dress.  The Court interprets the Complaint's identification of the "non-functional shape, dimensions, color, and yellow striping" (Am. Compl. ¶ 11), and the more specific enumeration of these elements in the initial interrogatory response, as identifying specific elements of the trade dress based on overall appearance, just as Plaintiff is required to do under the aforementioned authorities.[9]  The interrogatory in question asked Clearline to "describe the *specific characteristics* of that product that you contend constitute your trade dress," and thus Clearline reasonably responded with individual elements of its trade dress.

Accordingly, the Court interprets the trade dress as the overall appearance of the C-PORT® products, constituting the following elements:

(1) the shape, including the angle of orientation of the walls comprising the support block[10];
(2) the color of the support block (yellow on black or black with white flecks);
(3) the yellow stripe on the long sloped sides of the support block; and
(4) the dimensions of the support block.

## 2.  Non-Functionality

A plaintiff must prove that an unregistered trade dress is "not functional."  *See* Trademark Amendments Act of 1999 § 5, Pub. L. 106-43 (August 5, 1999), *codified at* 15 U.S.C.A. § 1125(a)(3).  Functionality is a question of fact.  *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 537 (5th Cir. 1998).

---

[9] Even if Cooper B-Line interpreted Clearline's complaints and interrogatory responses as enumerating "a list of elements consisting of less than the totality of features," 1 McCarthy on Trademarks and Unfair Competition §§ 8:1, 8:3 (4th ed.) (cited in Reply ¶ 10), Cooper B-Line should have been on notice that it must address the combination of elements identified.  As the Court holds Clearline to the elements identified in its complaints and interrogatory answers, Cooper B-Line is not prejudiced.

[10] *See* Part III.A.2.a for further discussion of the definition of this element.

In *TrafFix*, the Supreme Court held that the "traditional" test of functionality is whether the product feature "is essential to the use or purpose of the article or if it affects the cost or quality of an article.'" *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 32 (2001) (quoting *Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 165 (1995)) (other internal quotation marks omitted). "Under this traditional definition, if a product feature is 'the reason the device works,' then the feature is functional. The availability of alternative designs is irrelevant." *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002) (citing *TrafFix*, 532 U.S. at 33–34).[11]  The word "essential," as used in *TrafFix*, is a term of art; "[a] feature is 'essential to the use or purpose' of a product if it serves any significant function other than to distinguish a firm's goods or identify their source." *Poly-Am., L.P. v. Stego Indus., L.L.C.*, 3:08-CV-2224-G, 2011 WL 3206687, at *10 (N.D. Tex. July 27, 2011) (citing *Qualitex,* 514 U.S. at 165–66).

*TrafFix* also recognized a second test for functionality in aesthetic features: "a functional feature is one the 'exclusive use of which would put competitors at a significant non-reputation-related disadvantage.'" *TrafFix,* 532 U.S. at 24 (quoting *Qualitex Co.,* 514 U.S. at 165). However, "[w]here the design is functional under the [traditional] *Inwood* formulation there is no

---

[11] On this point, Clearline quotes Professor McCarthy, who asserts that "the Fifth Circuit later backtracked" from its position that alternative designs are irrelevant by saying "it would apply two tests: (1) a 'primary test' of whether the claimed feature is essential to the use or purpose of the product or affects the cost or quality of the product; and (2) a 'secondary test' of whether giving exclusive use to plaintiff would put competitors at a functional disadvantage."  1 McCarthy on Trademarks and Unfair Competition § 7:75 (4th ed.) (citing *Board of Supervisors for Louisiana State University Agricultural and Mechanical College v. Smack Apparel Co.*, 550 F.3d 465, 486 (5th Cir. 2008)).  The Court does not read *Smack Apparel* as overruling the relevant portion of *Eppendorf*, especially with respect to the traditional test of functionality.  However, the Court notes that unlike the Fifth Circuit, other courts have not interpreted the relevant portion of *TrafFix* to mean that consideration of alternative designs is always irrelevant. *See, e.g.*, *Valu Eng'g, Inc. v. Rexnord Corp.,* 278 F.3d 1268, 1276 (Fed. Cir. 2002) ("[T]he Court merely noted that once a product feature is found functional based on other considerations there is no need to consider the availability of alternative designs, because the feature cannot be given trade dress protection merely because there are alternative designs available. But that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place.").

need to proceed further to consider if there is a competitive necessity for the feature." *TrafFix*, 532 U.S. at 33.[12]

"Although *TrafFix* and *Eppendorf* focused on the individual features of the designs at issue, neither case expressly rejected the concept that the individual functional features may be arranged to produce an overall design that is nonfunctional." *Vantage Trailers, Inc. v. Beall Corp.*, CIV. A. H-08-0361, 2009 WL 1562179, at *2 (S.D. Tex. June 2, 2009). Other circuits, as well as district courts in this circuit, have found that individual functional features of a design may still, as a combination, be deserving of trade dress protection. *See Antioch Co. v. W. Trimming Corp.,* 347 F.3d 150, 157–58 (6th Cir. 2003); *Kodiak Prods. Co. v. Tie Down, Inc.,* No. 4:03–CV–1474–Y, 2004 WL 2599353, at *4 n.2 (N.D. Tex. Nov. 12, 2004); *Berg v. Symons*, 393 F. Supp. 2d 525, 555 (S.D. Tex. 2005) ("Although '[a] unique combination of elements may make a dress distinctive, [ ] the fact that a trade dress is composed entirely of commonly used or functional elements might suggest that the dress should be regarded as unprotectible [sic] or 'generic,' to avoid tying up a product or marketing idea.'" (quoting *Yurman Design,* 262 F.3d at 118)).

However, as explained in *Antioch*, "in order to receive trade dress protection for the overall combination of functional features, those features must be configured in an arbitrary, fanciful, or distinctive way." *Antioch,* 347 F.3d at 158 (citing *TrafFix,* 532 U.S. at 34). "In other words, where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is non-functional." *Id.* (citing *Eppendorf,* 289 F.3d at 358; *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 786 (9th Cir. 2002); *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.,* 199 F.3d

---

[12] Thus, non-functionality under the competitive necessity test is not a defense to functionality under the traditional test. The Court ignores Clearline's arguments about competitive necessity when introduced in response to Cooper B-Line's arguments under the traditional test.

1009, 1013 (9th Cir. 1999)); *see also Leatherman*, 199 F.3d at 1013 ("[Plaintiff] is correct that trade dress must be viewed as a whole, but where the whole is nothing other than an assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is nonfunctional.")   Professor McCarthy also suggests that courts should consider "a two-step enquiry into the functionality of both [1] the individual features and [2] the overall relationship and arrangement of those features," because "even if the overall combination of elements is functional, one or more individual parts might still be nonfunctional."  1 McCarthy on Trademarks and Unfair Competition § 7:76.

Clearline asks the Court to focus on the functionality of the overall appearance of the product, rather than the individual elements.  (Resp., Doc. No. 80, ¶ 21, 38.)  However, Clearline offers no competent summary judgment evidence regarding the functionality of the overall look. As the party asserting trade dress protection has the burden of proving functionality, *TrafFix*, 532 U.S. at 29, Clearline must present some evidence of non-functionality in order to avoid summary judgment.[13]  However, the only evidence provided by Clearline on this point is Mr. Krovats's conclusory statement that the overall appearance is non-functional, supported by the identification of other rooftop support products with different, alternative designs.  (Krovats Decl. ¶ 8.)[14]  As noted above, the Fifth Circuit has stated that evidence of alternative designs is "irrelevant" and "not germane to the traditional test for functionality," *Eppendorf*, 289 F.3d at

---

[13] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (Summary judgment may be granted "against a party who fails to make a showing sufficient to establish the existence of any element essential to that party's case, and on which that party will bear the burden of proof at trial.").

[14] Clearline also cites to the deposition of Robert M. Crain, who talks only about deriving the shape from plastic parking curbs, not about the overall appearance (Resp. ¶ 21 (citing Crain Depo. at 18:25–19:12)), and part of the deposition of Neil Krovats talking about the nonfunctionality of the shape.  (Resp. ¶ 21 (citing Krovats Decl. ¶ 5).)

357, 358, and thus the Court does not consider this evidence in making the functionality determination.

At the hearing on the pending motions, Clearline did not point to any summary judgment evidence of the non-functionality of the overall appearance, reiterating only that the appearance of the product was itself the only evidence it needed.  It also compared its trade dress to a Coca-Cola bottle, indicating that the Coca-Cola bottle performs a function of holding and distributing liquid, but its overall shape is protected as a non-functional trade dress because these elements do not contribute to or enhance that function.  *See Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Productions*, 134 F.3d 749, 756–57 (6th Cir. 1998) (Martin, C.J., dissenting); *Coca-Cola Co. v. Alma-Leo U.S.A., Inc.*, 719 F. Supp. 725, 728 (N.D. Ill. 1989) (describing the distinctiveness of the bottle); *Textron, Inc. v. U.S. Intern. Trade Com'n*, 753 F.2d 1019, 1027 (Fed. Cir. 1985) (noting that the fluting of the glass in the Coca-Cola bottle is nonfunctional). However, Clearline still has failed to identify any aspects of the overall shape or appearance that are arbitrary or ornamental, or that do not enable the C-PORT® products to perform their intended function, unlike the arbitrary curves and overall shape and design of the Coca-Cola bottle.

Thus, as Clearline has offered no competent summary judgment evidence of non-functionality of the overall appearance and combination of the elements, the Court must grant summary judgment on the functionality of the overall combination of elements, and proceed to evaluate the functionality of each individual element.  *See Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 134–36 (D. Mass. 2003) (granting summary judgment on the functionality of the overall appearance because Plaintiff "simply has not produced competent evidence supporting its claim of non-functionality of the overall design of its implant," and

14

proceeding to evaluate the individual elements of the asserted trade dress); 1 McCarthy on Trademarks and Unfair Competition § 7:76.

### a.  Shape

As an initial matter, it is unclear what elements of the "shape" that Clearline is claiming as its trade dress.  Citing to Mr. Krovats's deposition, Cooper B-Line asserts that Clearline is claiming only the "sloped side walls with narrower top wall and wider bottom."  (Mot. ¶ 14 (citing Krovats Depo. Mot. App. A, Doc. No. 1, at 145, 146).)  Clearline's Sur-Reply brings up various aspects of the shape, including the distinct cross-sectional shape, which it describes as an "isosceles trapezoid on top of a rectangle."  (Sur-Reply ¶ 12.)  Also, in its Sur-Reply, it first mentions that the angles of the top wall and sloped side walls of the C-PORT® and DURA-BLOK™ are almost identical, at approximately 50 degrees.  (Sur-Reply ¶ 9, n.3 (citing Herrera Preliminary Report, Doc. No. 96-1, at 30–31 (APP 000407–08)).)  However, Clearline does not introduce any evidence of the non-functionality of these elements of the shape.  As the party asserting trade dress protection has the burden of proving functionality, *TrafFix*, 532 U.S. at 29, Clearline must present some evidence of non-functionality in order to avoid summary judgment. However, the only evidence of non-functionality cited relates to the sloped walls (Krovats Decl. ¶ 5; Resp. ¶ 8), or alternative designs.  As stated above, alternative designs are irrelevant to the traditional functionality inquiry, and this evidence will not be considered.[15]  *Eppendorf*, 289 F.3d at 357, 358.

---

[15] Clearline relies heavily on *W.T. Rogers Co., Inc. v. Keene*, 778 F.2d 334 (7th Cir. 1985), in which the Seventh Circuit found the shape of the product nonfunctional because the plaintiff "could have chosen for his end panel an oval, a pentagon, a trapezoid, a parallelogram, an octagon, a rectangle covered with arabesques, or machicolated, or saw-toothed. The hexagon is not the only feasible shape for the side of a tray." *Id.* at 343.  *Keene* articulated the relevant inquiry as: "[i]f effective competition is possible without copying that feature, then . . . it is not a functional feature." *Id.*  However, as stated above, after *TrafFix*, the relevant inquiry is whether the product feature is "the reason the device works;" the availability of alternative designs is irrelevant. *Eppendorf*, 289 F.3d at 355 (citing *TrafFix*, 532 U.S. at 33–34).

Cooper B-Line identifies at least ten rooftop support blocks with the same design of sloped side walls with the narrower top wall and wider bottom.  (Mot. App. A, Exs. 11–17, 20–21, 24, Doc. Nos. 73-12, 73-13, 73-14.)  The KeyCurb, made by RoofTop Accessories, and the EcoCurb, made by Advanced Support Products, have almost identical shapes and dimensions as the C-PORT® products.  (Price Depo., Mot. App. B, Doc. No. 73-17, at 92–94; Mot. App. B, Exs. 5–6, Doc. No. 73-18.)  Clearline does not dispute that these other products have identical shapes or sloping sides, but argues only that they do not have the same color scheme and overall configuration as the C-PORT® products.  (Resp. ¶ 20.)

Mr. Price, a former sales manager for Cooper B-Line who now works for a competing company, testified that the sloped side walls with the narrower top wall and wider bottom provides several benefits.  These benefits include lowering the center of gravity of the support to make it more stable (Price Depo. at 70), requiring less material and thus cutting the cost of manufacturing (Price Depo. at 71), and permitting rain, snow, and condensation to flow off of it rather than pool on top of it.  (Krovats Depo., Mot. App. A, Doc. No. 1, at 188; Price Depo. at 68–69.)  Clearline states that the accumulation of these substances has no functional impact on the operation of the C-PORT® and surrounding equipment.  (Krovats Depo. at 188–190; Krovats Decl., Doc. No. 85, ¶ 5 (APP 000004).)  Moreover, Clearline argues that a strictly triangular cross-section would minimize the center of gravity more efficiently than the shape of the C-PORT® (Resp. ¶ 42); however, this again is evidence of an alternative design, which is irrelevant to the traditional functionality analysis.  *Eppendorf*, 289 F.3d at 357, 358.

Cooper B-Line also asserts that the design is the subject of and is disclosed in two utility patents and a patent application.  (*See* Mot. ¶ 17 (citing U.S. Patent No. 7,168,210, Mot. App. A, Ex. 25, Doc. No. 73-14("'210 patent"); U.S. Patent No. 7,866,093, Mot. App. A, Ex. 26, Doc.

No. 73-14 ("'093 patent"); U.S. Patent Application Publication US 2011/0113703, Mot. App. A,

Ex. 27, Doc. No. 73-15.)  As the Supreme Court stated:

> A prior patent . . . has vital significance in resolving the trade dress claim. A utility patent is strong evidence that the features therein claimed are functional. If trade dress protection is sought for those features the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection. Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device.
> . . .
> In a case where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as arbitrary curves in the legs or an ornamental pattern painted on the springs, a different result might obtain. There the manufacturer could perhaps prove that those aspects do not serve a purpose within the terms of the utility patent. The inquiry into whether such features, asserted to be trade dress, are functional by reason of their inclusion in the claims of an expired utility patent could be aided by going beyond the claims and examining the patent and its prosecution history to see if the feature in question is shown as a useful part of the invention.

*TrafFix*, 532 U.S. at 29–30; 34.

Clearline contends that the shape is not disclosed in the patents.  Mr. Krovats contends

that the patent claims describe a generic block with sloped sides; however, they do not disclose

the specific shape of an isosceles trapezoid on top of a rectangle.  (Krovats Decl., Doc. No. 85,

¶¶ 19–21 (APP 000006).)[16]  However, as stated above, Clearline has introduced no evidence

regarding the functionality of any part of the shape except the sloped side walls, and thus the

Court need not analyze the patent claims any further.  Although the patent claims cover the

---

[16] Cooper B-Line, in its Reply, asks the Court to disregard Mr. Krovat's declaration as a sham declaration, because he previously testified that the drawings and claims of the various patents disclosed the C-PORT® products. However, the Court believes that this testimony supplements and explains Mr. Krovat's previous deposition testimony, rather than directly conflicting.  Mr. Krovats said that the claims describes the C-PORT® support blocks pictured in patent drawings, but did not say that the claims described every detail of the support blocks.  Moreover, the does not use Mr. Krovat's declaration in making this determination.  The construction of a patent is not an issue of fact, but is a matter of law exclusively within the province of the Court.  *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996).

sloped walls at issue here, the Supreme Court has not said that a patent is dispositive, only that it "adds great weight to the statutory presumption that features are deemed functional until proved otherwise." *TrafFix*, 532 U.S. at 30.

Mr. Krovats also made representations to the U.S. Patent and Trademark Office ("USPTO") regarding the functionality of the sloped side walls and the material.  He stated that "the walls are arranged to distribute the load from the top wall while permitting relative movement between the object on the top wall and the flat bottom by the flexing of the elastomeric walls."  (Doc. No. 90-2 at CL002277.)  He also represented that "the structure of the sloped side walls extending between perpendicular end walls as in the present invention when the walls are formed of elastomeric material is a key feature of the present invention which provides a balance of lateral weight and distribution with vibration damping resiliency together with sufficient strength to support various rooftop objects thereon."   (Doc. No. 90-3 at CL002258.)

"It is well settled that [the Fifth Circuit] does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495–96 (5th Cir. 1996).  As the Fifth Circuit has noted, "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Doe ex rel. Doe v. Dallas Independent School Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (quoting *Perma Research and Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969)).  However, courts must be careful to distinguish between "discrepancies which create transparent shams and

discrepancies which create an issue of credibility or go to the weight of the evidence." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).

Cooper B-Line did not assert that these statements were made by Mr. Krovats under oath. At the hearing, Cooper B-Line was unsure of whether they needed to be made under oath, or whether they must be sworn by Mr. Krovats or only the attorney.  Thus, Mr. Krovats's subsequent statements about the non-functionality of the sloped sides may not be disregarded as a sham.

As evidence of non-functionality, Clearline presents testimony regarding how it chose the shape only because it was distinctive, not for any utilitarian purpose.  (Krovats Decl. ¶ 5.) Cooper B-Line argues that this is not competent summary judgment evidence of non-functionality.  (Reply ¶ 23.)  The Court agrees that evidence regarding the reason for the selection of an element for inclusion in a product is not sufficient to create an issue of material fact regarding whether the element is non-functional.  Mr. Krovats did not swear that the sloped walls actually were non-essential or did not affect the cost or quality of the C-PORT® product; he argued that this element was not *selected* or *intended* for this purpose.  The Supreme Court, in *TrafFix*, did not find that an owner of an asserted trade dress must also intend for the elements to be functional.  Rather, intent did not factor into the Supreme Court's decision, and Clearline provides no reason why it should be relevant to this Court's inquiry.

The Court thus finds that Clearline has failed to provide any evidence of non-functionality sufficient to meet its burden on summary judgment with respect to shape, and grants summary judgment on the functionality of this element.

### b.  Dimensions

It is unclear which dimensions that Clearline is claiming constitute part of this element of its trade dress.  The Court will discuss height and length, as they are the dimensions discussed by the parties in the briefs.

With respect to height, Cooper B-Line asserts that a support block that is four inches high is the ideal size for replacing or retrofitting the wood blocks that were previously used as rooftop supports.  (Krovats Depo. at 180; Price Depo. at 94–95.)  Clearline responds that the wooden support blocks were made out of 4-by-4 pieces of wood, and were actually closer to 3.5 inches high.  (Krovats Decl. ¶ 32.)  However, Clearline fails to provide any evidence showing that the height is non-functional because it is arbitrary or incidental.

With respect to length, Clearline asserts that Cooper B-Line copied the first C-PORT® products, which have a length of 9.6 inches, and that this length resulted when Clearline cut a 48-inch rubber block into five pieces.  (Resp. ¶ 42 (citing Krovats Depo. at 157–58).)  However, again, non-functionality may not be proven through evidence that an element was selected for a non-functional reason.[17]

Cooper B-Line states that Clearline utilizes different dimensions and lengths exist to allow for a variety of applications (Krovats Depo. at 176, 217), and a length between six and twelve inches is standard to allow the blocks to be transported up a ladder or on a lift.  (Price Depo. at 95.)  The '093 patent also discloses that the C-PORT® support blocks are sized according to their application.  (Krovats Depo. at 216; Mot. App. A. Ex. 26.)  Clearline has thus failed to provide evidence sufficient to meet its burden with respect to the dimensions, and the Court must grant summary judgment of functionality on this element.

---

[17] Even if this type of evidence would be sufficient, the portion of Mr. Krovats's deposition cited says nothing about the 9.6 inch length or how it was selected.  Rather, he asserts only that Clearline cut the parking curb into pieces, without stating how many pieces or why he selected this length or division.

### c.   Color Scheme and Yellow Stripe

Clearline has identified the yellow on black color scheme and the yellow stripe as elements of its trade dress.

Cooper B-Line asserts that the yellow, reflective stripes on the support blocks are functional because they provide a safety benefit in making the blocks more visible in low light conditions.  (Price Depo. at 73, 100.)  Yellow is commonly used as a color indicating caution and for marking physical hazards.  *See* 29 C.F.R. 1910.144; *Baughman Tile Company, Inc. v. Plastic Tubing, Inc.*, 211 F. Supp. 2d 720, 725 (E.D.N.C. 2000).  Cooper B-Line added a stripe to both sides as an improvement over the C-PORT® product, since the C-PORT® products could only be seen if they were oriented the wrong way.  (Price Depo. at 102–03.)  It incorporated this feature into its products based on the feedback of customers desiring this feature.  (Declaration of Chris Peeler, Doc. No. 73-19, ¶ 6.)

Additionally, Cooper B-Line provides a Clearline advertisement touting the yellow strip as a "[r]eflective safety strip for easy visibility."  (Mot. App. D, Ex. 2, Doc. No. 73-20 (CL 000106).)  When Cooper B-Line was selling C-PORT® products, it advertised the yellow stripe as a safety feature.  (Price Depo. at 100.)  Likewise, current C-PORT® distributors advertise the yellow stripe as a benefit because it is reflective at night.  (Mot. App. A  Ex. 6, Ex. 9; Krovats Depo. at 49–50, 112, 159, 161–62, 179.)  *See Valu Engineering, Inc. v. Rexnord Corp.,* 278 F.3d 1268, 1274 (Fed. Cir. 2002) (holding that a consideration in determining whether a particular product feature is functional is the existence of "advertising materials in which the originator of the design touts the design's utilitarian advantages").

Clearline states that the yellow stripe was chosen not for any utilitarian purpose, but only for the aesthetic look and to identify Clearline's product.  (Krovats Decl. ¶ 7.)  Additionally, it

asserts that the yellow stripe, as contained on its product, cannot be functional, as it can only be seen from one direction.  (*Id*; Krovats Depo. at 163.)  The pipes cover half of the C-PORT® product when installed on a roof, and the yellow pipes would be visible to anyone walking on the roof.  (Krovats Depo. at 163.)  Clearline points out that Mr. Krovats testified that, from at least some pictures at the right angles, one can see the C-PORT® products and yellow stripe, even when installed on the roof with a pipe.  (Krovats Depo. at 164–65; Mot. App. A. Ex. 9.)  However, based on the evidence cited by Cooper B-Line, Mr. Krovats did not contradict his own previous statements about visibility of the stripe, such as by conceding that the yellow stripe is always visible, which would  This evidence is enough to create an issue of material fact with respect to the functionality of the yellow stripe.

With respect to the overall color scheme of the product, Cooper B-Line argues it is functional because black or black with white flecks is the natural color of the manufacturing process of recycled tire rubber.  *See Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 366 (S.D.N.Y. 2003) (finding an element of the trade dress was "a functional result of the manufacturing process," and thus not protectable).  Recycled tire rubber provides many benefits, including being low-cost, environmentally friendly and qualifying for LEED credits, it is of such a weight that it will not blow away, it aids in dampening vibration, it can be applied to many roofing materials without an additional pad, it is not sharp or abrasive, and it is UV and weather resistant.  (Peeler Decl. ¶ 6; Mot. App. A Ex. 10.)  Additionally, the '093 patent discloses the use of recycled tire rubber in claim 2, and both the patent and other statements to the USPTO, quoted above, tout the benefits of this "elastomeric material." (Doc. No. 90-2 at CL002277; Doc. No. 90-3 at CL002258.)

Again, Clearline asserts that it did not begin using recycled tire rubber for any functional purpose (Krovats Decl. ¶ 6), but does not assert that it is not essential to the use or purpose of the article or that it does not affects the cost or quality of an article.  However, Clearline is not asserting that the material is part of its trade dress, or even the black color, but only the yellow on black combination.  Clearline states that the yellow on black color scheme was incorporated into its catalogs and advertising materials to ensure that customers would associate the yellow and black motif with C-PORT® and Clearline.  (Krovats Decl. ¶ 7.)  Again, Clearline testified that the blocks and yellow stripes were not always visible under the pipes, so the fact that yellow and black is often used to indicate caution is not dispositive of the function of that color scheme for these blocks.[18]  Since the Court finds an issue of material fact with respect to the functionality of the yellow stripe, it also denies summary judgment regarding the functionality of the color scheme.

### 3.  Secondary Meaning

Plaintiff has asserted that its trade dress encompasses its product design.  Product design is never inherently distinctive, and thus Clearline must prove secondary meaning to prevail.  *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212–13 (2000).

To determine whether a trade dress has "secondary meaning," courts inquire into "the public's mental association between the mark and the alleged mark holder" to determine whether "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself."  *Bd. of Supervisors for La. State Univ. Agric. and Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir. 2008) (citing *Wal-Mart*, 529 U.S. at

---

[18] Cooper B-Line clarified in the hearing that it moved for summary judgment only under the traditional test and not under the competitive necessity test.  Thus, the Court does not evaluate the evidence under that test, even though some of Cooper B-Line's evidence, such as the assertion that yellow on black is a commonly-used color scheme for caution, would be better suited for that analysis.

211).  Courts in the Fifth Circuit consider a combination of a number of factors in this inquiry, including:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress.

*Pebble Beach*, *Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 543 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices*, 532 U.S. 23.  Whether a mark has acquired secondary meaning is a question of fact.  *Amazing Spaces*, 608 F.3d at 234.

Cooper B-Line contends that the public has never identified the C-PORT® products with Clearline.  When Cooper B-Line was selling the Clearline products, it marketed them as if they were Cooper B-Line products, not Clearline Products (Krovats Depo. at 290–91), and distributors generally perceived them to be Cooper B-Line products.  (*Id.* at 35–36; 80–81.)  None of the C-PORT® products has ever had Clearline's name on them.  (*Id.* at 102–03; 105.)

Clearline presents evidence that at least two projects' design papers specifically identify C-PORT® products as being manufactured by Clearline.  (APP 000282; APP 000289.)  Cooper B-Line's customers contacted Clearline on at least two occasions, showing that customers recognized Clearline as the source of C-PORT® products.  (Peeler Depo. at 182, 183–86, 192–93.)

However, as the Court granted summary judgment on the overall appearance claim and is left with only the elements of the yellow stripe and yellow on black color scheme, it must look for evidence of secondary meaning of these elements individually.  *See Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 137 (D. Mass. 2003) (citing *Textron, Inc., v. U.S. Intern. Trade Comm.*, 753 F.2d 1019, 1027 (Fed. Cir. 1985)).  Mr. Krovats swore that "Clearline's customers knew that the yellow stripe indicated that the product came from

24

Clearline," and that "Clearline has used a yellow and black color scheme on its catalogs and advertising materials to ensure that [its] customers would associate the yellow and black motif with Clearline and its C-PORT® producs."  (Krovats Decl. ¶ 7.)  The C-PORT® mark contains the letter "C" with a yellow and black border to associate this color scheme with the products.  (*Id.*)  This is sufficient to create an issue of material fact, and the Court cannot grant summary judgment on this issue.

### 4.   Infringement and Likelihood of Confusion

As explained above, infringement occurs where "the use creates a likelihood of confusion as to the 'source, affiliation, or sponsorship'" of the alleged infringer's product.  *Pebble Beach,* 155 F.3d at 543 (citing 15 U.S.C. § 1125(a)(1)(A)).  "'Likelihood of confusion' means more than a mere possibility; the plaintiff must demonstrate a probability of confusion."  *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009).  Courts "examine the following nonexhaustive 'digits of confusion' in evaluating likelihood of confusion: (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers."  *Id.* at 227.  "No digit is dispositive, and the digits may weigh differently from case to case, depending on the particular facts and circumstances involved."  *Id.* (quotation marks omitted).  "[L]ikelihood of confusion is typically a question of fact." *Id.*

Cooper B-Line asserts that Clearline cannot produce evidence that Cooper B-Line's use of the dress creates a likelihood of confusion.  Mr. Krovats was unable to identify anyone who thought that the DURA-BLOK™ was a Clearline product.  (Krovats Depo. at 77.)  However, Clearline notes that actual confusion is just one factor, and, nevertheless, that Mr. Krovats stated that, on one occasion, a distributor sent Clearline a purchase order for 400 DURA-BLOK

products, clearly evidencing confusion.  (Krovats Decl. ¶ 26.)  Clearline also provides evidence

that Cooper B-Line intended to pass off its product as that of Clearline, as Cooper B-Line used

drawings and samples of the C-PORT® product in creating its own product line.  (Peeler Depo.

at 159–60, 164–65.)

Clearline also asserts that the products look similar, were used for the same purpose, sold

through the same outlets to the same customers, and advertised in the same media.  (Resp. ¶¶ 53–

54 (citing Krovats Depo. at 46–47 (APP 000082); RFA Resp. 99, Doc. No. 85 (APP 000027)).)

However, the sources cited do not support these assertions.[19]   Nevertheless, because of the

evidence mentioned in the preceding paragraph, the Court finds that Clearline has established an

issue of material fact on this issue.

### 5.  Damages

Cooper B-Line also argues that Clearline cannot produce evidence that it sustained any

damages as a result of Cooper B-Line's alleged infringement of its trade dress.  Clearline asserts

that Cooper obtained greater profits than it otherwise would have had it not copied Clearline's

product line, and that Clearline's U.S. sales suffered as a result.  The Court already found an

issue of material fact relating to the likelihood of confusion.   (*See* Part III.A.4, *supra*.)

Clearline's expert on damages, Dr. Prescott, asserts that Clearline has lost $4,151,785.00 since

the infringement began in 2008.  (Prescott Suppl. Report at 4 (APP 000301).)[20]

---

[19] In particular, the portion of Mr. Krovats's deposition cited discusses only the types of consumers that buy C-PORT® products.  Also, APP 000027 is a copy of a web page showing a rooftop support product with different shapes, colors, and configurations.  (*See* Krovats Decl. ¶ 8.)

[20] Citing *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 480 (6th Cir. 2008), Cooper B-Line asserts that this report is inadmissible hearsay.  In *Sigler*, the court found the reports to be hearsay because the experts had not submitted sworn declarations or affidavits.  Clearline has now submitted a declaration from Dr. Prescott in which he restates the conclusions of his report under penalty of perjury.  (Prescott Decl., Doc. No. 96-1, at APP 000470–71.)  Clearline moved for leave to introduce this report into summary judgment evidence (Doc. No. 95), and Cooper B-Line does not object to the filing of this declaration.  (Resp. to Mot. for Leave to File, Doc. No. 98, at ¶ 6.)  Accordingly, the Court granted the Motion for Leave to Supplement Summary Judgment Evidence (Doc. No. 95) at the hearing on these motions.  Additionally, the Court agrees with Cooper B-Line that, generally, Clearline was not

Cooper B-Line states that this evidence is insufficient, arguing that Clearline has not offered any evidence that those profits were lost as a result of trade dress infringement, as opposed to some other cause.  (Reply ¶ 15.)  However, the Fifth Circuit has stated that a plaintiff need not introduce evidence of actual diverted sales.  *Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 126 (5th Cir. 1991); *see also Smack Apparel*, 550 F.3d at 474.   Cooper B-Line's argument is better seen as one challenging the calculation of Dr. Prescott, rather than a successful challenge to the existence of any damages.

### B.  Trademark Infringement

#### 1.  Likelihood of Confusion

Cooper B-Line also moves for summary judgment on Clearline's trademark infringement claim, stating that Clearline cannot produce evidence that Cooper B-Line's use of the C-PORT® mark creates a likelihood of confusion.  In Response, Clearline presented evidence that purported to show that Cooper B-Line used the C-PORT® mark in its meta-tags or internet code.  Cooper B-Line challenged many of the documents presented as "unsponsored, unexplained[,] and hearsay," and the testimony as based on unauthenticated and hearsay documents.  (Reply ¶ 29.)  Clearline was allowed to respond to this challenge in a Sur-Reply, including by submitting evidence that was not hearsay.

Additionally, Clearline's Response claimed that Cooper B-Line used Clearline's mark in trade show advertisements.  (Resp. ¶ 63 (citing APP 000240–45).)   Cooper B-Line also challenged this assertion on the basis that no evidence showed that Cooper B-Line was the party responsible for providing that information to the International Roofing Expo.  (Reply ¶ 31.)

---

permitted to use the Sur-Reply to supplement the record with additional evidence and arguments to bolster its claims, unless directly responding to a new argument in the Reply.  Thus, the Court will disregard the information contained therein, with the exception of some of the evidence expressly noted elsewhere in this Order. (*See* Part III.B, *infra*.)

Clearline was entitled to supplement its summary judgment evidence in its Sur-Reply with evidence showing that Cooper B-Line was responsible for submitting the information to the publisher.  (Sur-Reply ¶ 19 (citing Hanley DWQ Responses, APP 000420–21).)

At the hearing, Cooper B-Line reiterated that it objected to these pieces of evidence contained in the Sur-Reply.  The Court need not resolve this issue[21], however, because Clearline also submitted evidence, contained in Cooper B-Line's requests for admissions, that Cooper B-Line used Clearline's registered trademark in meta-tags on its website after their relationship ended.  (Defendant Cooper B-Line, Inc.'s Responses to Plaintiff's First Set of Requests for Admission, Doc. No. 83, at 13–15 (APP 000319).  Because the products were so similar in appearance, this evidence is sufficient to create an issue of material fact with respect to whether use of the C-PORT® mark was likely to cause confusion as to the source, sponsorship, or affiliation of the DURA-BLOK™ products.  *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 465 (7th Cir. 2000) ("[U]sing another's trademark in one's metatags . . . is significant evidence of intent to confuse and mislead." (citing *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1064 (9th Cir. 1999)); *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 304 F.3d 936 (9th Cir. 2002) ("[A]ctionable initial interest confusion on the Internet is determined, in large part, by the relatedness of the goods offered and the level of care exercised by the consumer.").

### 2.  Damages

Additionally, Cooper B-Line asserts that Clearline cannot produce any evidence that it sustained any damages as a result of Cooper B-Line's alleged use of its mark.  As noted above, Clearline has identified the decline in its sales and profits since the infringement began, and the Court finds this sufficient to meet its burden.  The Court finds an issue of material fact.

---

[21] Cooper B-Line can reassert these arguments at trial if it wishes to exclude any of this evidence.

**IV.     CONCLUSION**

Based on the foregoing, Cooper B-Line's Motion for Partial Summary Judgment is **GRANTED IN PART**.  The Motion is granted with respect to the trade dress incorporating the overall appearance of the product, as well as every individual element of the trade dress identified by Clearline except the yellow stripe and the yellow on black color scheme.  The Court denies the Motion with respect to Clearline's trademark infringement claim.

**IT IS SO ORDERED**.

**SIGNED** in Houston, Texas, on this the 2nd day of July, 2012.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE