**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CLEARLINE TECHNOLOGIES LTD.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. H-11-1420** |
| | § | |
| **COOPER B-LINE, INC., et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM AND ORDER</u>

Pending before the Court are the following motions:

1) Clearline Technologies, Ltd.'s ("Clearline" or "Plaintiff") Motion for Pleading Amendment (Doc. No. 159);

2) Cooper B-Line Inc.'s ("Cooper") Renewed Motion for Judgment as a Matter of Law ("JMOL") (Doc. No. 161);

3) Clearline's Renewed Motion for JMOL (Doc. No. 160);

4) Clearline's Motion for Enhanced Damages (Doc. No. 156);

5) Clearline's Motion for Supplemental Actual and Enhanced Damages (Doc. No. 184);

6) Clearline's Motion for Award of Interest (Doc. No. 155);

7) Clearline's Motion for Permanent Injunction (Doc. No. 157); and

8) Clearline's Motion for Attorney's Fees and Costs (Doc. Nos. 158).

Upon considering the Motions, all responses thereto, the applicable law, and oral arguments, the Court finds that:

1) Clearline's Motion for Pleading Amendment must be **DENIED**;

2) Cooper's Renewed Motion for JMOL must be **DENIED**;

3) Clearline's Renewed Motion for JMOL must be **DENIED**;

4) Clearline's Motion for Enhanced Damages must be **DENIED**;

5) Clearline's Motion for Supplemental Actual and Enhanced Damages must be **GRANTED IN PART AND DENIED IN PART WITHOUT PREJUDICE TO REFILING**;

6) Clearline's Motion for Award of Interest must be **GRANTED IN PART AND DENIED IN PART**;

7) Clearline's Motion for Permanent Injunction must be **GRANTED IN PART AND DENIED IN PART**;

8) Clearline's Motion for Attorney's Fees and Costs must be **DENIED**.

## I.     BACKGROUND

This case involves claims of trade dress and trademark infringement.  Clearline contends that Cooper's DURA-BLOK™ rooftop support products infringe on its C-PORT® products.  At trial, Clearline argued that Cooper infringed on two aspects of its trade dress: a yellow reflective stripe and a yellow and black color scheme.  It also argued the Cooper infringed on Clearline's C-PORT® trademark by using it in the meta-tags on Cooper's website and in a tradeshow catalog.

The jury returned a split verdict.  (Doc. No. 151.)  With regard to Clearline's trade dress claims, the jury found that the use of reflective yellow striping was not non-functional, and did not create a likelihood of confusion as to the source, affiliation, or sponsorship of Cooper's product, two independent reasons for finding no trade dress infringement as to the yellow reflective stripe.  (*Id.* at 2, 4.)  As to the yellow and black color scheme, the jury determined that the color scheme was non-functional, had acquired a secondary meaning, and created a likelihood of confusion as to the source, affiliation, or sponsorship of Cooper's product.  (*Id.* at 2–4.)  These conclusions constitute a finding of trade dress infringement as to use of the yellow and black color scheme.  Furthermore, the jury concluded that Cooper's actions relating to its trade dress infringement were done willfully.  (*Id.* at 5.)  It awarded Clearline $2,660,000 in lost

profits, and $3,200,000 in profit disgorgement damages for Cooper's trade dress infringement. (*Id.* at 6–7.)

As to Clearline's trademark infringement claims, the jury found that Cooper's use of the C-PORT® trademark in meta-tags on its website did not create a likelihood of confusion as to the source, affiliation, or sponsorship of Cooper's product.  (*Id.* at 8.)  It found that Cooper's use of the C-PORT® trademark in a tradeshow catalog, however, did create a likelihood of confusion as to the source, affiliation, or sponsorship of Cooper's product, a finding that was sufficient to find trademark infringement, as none of the other elements of a trademark infringement claim were contested.  (*Id.*)  Nonetheless, the jury concluded that this trademark infringement did not entitle Clearline to any amount of lost profits or profit disgorgement.  (*Id.* at 10–11.)

Both parties have now filed numerous post-trial motions.  The Court will first turn to Clearline's Motion for Pleading Amendment.  It will then address the motions for JMOL filed by both sides.  Finally, the Court will address the motions regarding remedies, starting with damages.

## I.  PLEADING AMENDMENT

### A.  Legal Standard

Rule 15(b) provides in relevant part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. . . . [F]ailure so to amend [the pleadings] does not affect the result of the trial of these issues.

Fed. R. Civ. P. 15(b).  "The purpose of the rule is to allow the course of the trial, rather than the formal pleadings, to control the outcome."  *Flannery v. Carroll*, 676 F.2d 126, 131 (5th Cir. 1982).  However, "it is not often that amendments are allowed *after the close of evidence,* since

the opposing party may be deprived of a fair opportunity to defend and to offer any additional evidence." *Triad Elec. & Controls, Inc. v. Power Sys. Eng'g, Inc.*, 117 F.3d 180, 193–94 (5th Cir. 1997) (citing *T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338, 370 (5th Cir. 1980)) (emphasis in original).   Accordingly, "trial of unpled issues by implied consent is not lightly to be inferred under Rule 15(b), [and] such inferences are to be viewed on a case-by-case basis and in light of the notice demands of procedural due process." *Triad*, 117 F.3d at 193–94 (citing *Jimenez v. Tuna Vessel Granada*, 652 F.2d 415, 422 (5th Cir. 1981)).

"[T]rial by implied consent turns on: whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond." *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 332 (5th Cir. 1994) (citing *United States v. Shanbaum*, 10 F.3d 305, 312–13 (5th Cir. 1994)).   A party does not consent to try "a new issue by introducing evidence or failing to object to evidence when the evidence is relevant to pleaded issues in the case." *Moody v. FMC Corp.*, 995 F.2d 63, 66 (5th Cir. 1993) (citing *Jimenez*, 652 F.2d at 422; *Int'l Harvester Credit Corp. v. E. Coast Truck and R.V. Sales, Inc.*, 547 F.2d 888, 890 (5th Cir. 1977)).

## B.    Analysis

Clearline seeks leave to amend its complaint to add a claim that Cooper used its C-PORT® trademark in its internet website code.  (Doc. No. 159-1 at 2.)  Plaintiff's live complaint alleges only that Cooper used Clearline's trademark in its meta-tags, a specific type of code. (Doc. No. 67 at 39.)  Prior to trial, the parties filed a joint pre-trial order indicating that the parties disagreed as to the level of specificity with which the trademark infringement question ought to be posed to the jury.  (*Compare* Doc. No. 128-8 at 27 *with* Doc. No. 128-9 at 15.)

Clearline requested a broad question on the verdict form, asking whether Clearline had proven by a preponderance of the evidence that Cooper infringed on Clearline's trademark.  (Doc. No. 128-8 at 27.)  Cooper requested more granular questions on the verdict form.  With regard to the allegations of trademark infringement on Cooper's website, Cooper requested the jury be asked specifically whether Cooper's use of Clearline's trademark in its meta-tags was infringing.  (Doc. No. 128-9 at 15.)[1]  The Court, upon reviewing the competing jury instructions and the live pleadings, and after hearing arguments on the jury charge, agreed with Cooper that the charge and the verdict form should limit the trademark infringement claim to use of the C-PORT® trademark in meta-tags.  (*See* Doc. No. 161-1, Ex. A at 11, Doc. No. 161-2 at 8.)

At trial, the jury heard evidence that Cooper used the C-PORT® trademark in its alt-tags, a code distinct from meta-tags.  (Trial Tr. 181:18–184:24; 804:18–22; 921:7–13, 921:22–922:8, 926:25–927:3, 934:6–936:9; 957:14–21; 1097:16–1099:22.)  Some of this evidence was presented by Cooper to rebut Clearline's allegations that the C-PORT® mark was used in Cooper's meta-tags, by showing that, to the extent the mark was present in Cooper's code, it was in the alt-tags and not the meta-tags.  (*See, e.g.*, 1097:16–1099:22.)  During deliberations, the jury specifically asked whether meta-tags and alt-tags are interchangeable.  (*See* Doc. No. 167-1 at 5.)  After hearing argument from the parties, the Court instructed the jury that "[m]eta-tags and alt-tags refer to different types of code used on web pages."  (*Id.*)  The jury subsequently answered "no" to Question 7, Part A, which asked, "Did Cooper B-Line's use of the C-PORT trademark in its meta-tags without the consent of Clearline create a likelihood of confusion as to the source, affiliation, or sponsorship of Cooper B-Line's product?"  (Doc. No. 151 at 8.)

---

[1] A separate allegation of trademark infringement based on Cooper's use of Clearline's trademark in its tradeshow catalogues was also before the jury.

On this set of facts, the Court concludes that Clearline's Motion for Pleading Amendment must be denied.  During the period leading up to trial, and during trial, Cooper clearly opposed Clearline's attempts to broaden its trademark infringement claim beyond the scope of the live pleadings.  *See Portis*, 34 F.3d at 332.  This is evident from Cooper's insistence on a jury charge and verdict question limiting the inquiry to meta-tags.  (Doc. No. 128-9 at 15; Doc. No. 142.)  Furthermore, Cooper relied on evidence that Clearline's mark was in alt-tags, not meta-tags, to defend itself against Clearline's claim.  (*See, e.g.*, 1097:16–1099:22.)  There is no doubt that Cooper would be prejudiced by any grant of leave to amend at this stage.  Cooper was never on notice that its use of the C-PORT® trademark in alt-tags had entered the case as a claim.  *See Moody*, 995 F.2d at 66.  Finally, allowing such an amendment after the trial would severely prejudice Cooper.  Cooper almost certainly would not have employed the trial strategy it did had it been on notice that Clearline was alleging it had infringed on its mark in "internet website code" generally.   Instead, it likely would have focused its efforts on showing that use of the C-PORT® trademark in its website code was not likely to cause confusion.  If Clearline is allowed to amend now, Cooper will be denied the opportunity to present any evidence showing that use of the mark in its internet code generally, and in alt-tags specifically, was not likely to cause confusion.  *See Triad*, 117 F.3d at 193–94.

## II.    JMOL

### A.    Legal Standard

The Fifth Circuit reviews a district court's ruling on a motion for judgment as a matter of law *de novo*.  *See Cambridge Toxicology Grp., Inc. v. Exnicios*, 495 F.3d 169, 179 (5th Cir. 2007).  Judgment as a matter of law is appropriate "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient

evidentiary basis to find for the party on that issue." *See* Fed. R. Civ. P. 50(a)(1); *Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 927 (5th Cir. 2006).  "The decision to grant a directed verdict . . . is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury." *Omnitech Int'l v. Clorox Co.*, 11 F.3d 1316, 1323 (5th Cir. 1994) (citations omitted) (internal quotation marks omitted).  A legally sufficient evidentiary basis requires more than a mere scintilla of evidence. *Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 211 (5th Cir. 1998).

The trial court is required to consider the entire record when considering a renewed judgment as a matter of law motion. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 149–50 (2000).  Therefore, a court "should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1040 (5th Cir. 2011).

### B.    Cooper's Motion for JMOL (Doc. No. 161)

Cooper moves for judgment as a matter of law.  It argues that: 1) the jury's conclusion that a yellow reflective stripe is functional mandates the conclusion that the yellow on black color scheme also be found functional because black is the color of recycled rubber, a functional material; 2) the yellow on black color scheme is a competitive necessity, an independent ground for finding it functional; 3) there was insufficient evidence to establish secondary meaning; 4) the jury's finding that the use of a yellow stripe did not create a likelihood of confusion requires a finding that the use of a yellow and black color scheme did not create a likelihood of confusion; 5) there is insufficient evidence to uphold the jury's finding of willful trade dress infringement; 6) the damages award is unsustainable because award of lost profits and Cooper's

sales is a double recovery, and, in any event, there is insufficient evidence to support the amounts awarded as lost profits and disgorgement profits; and 7) there is insufficient evidence to support the jury's finding of likelihood of confusion by Cooper's use of the Clearline's trademark.  (*See generally* Doc. No. 161.)  The Court addresses each argument, and Clearline's response, in turn below.

### 1. Trade Dress Infringement

To prove infringement of a trade dress, a plaintiff must show (1) that the dress is protectable, and (2) that infringement has occurred.  *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 425 (5th Cir. 1984), *abrogated on other grounds by TrafFix Devices, Inc. v. Mrkg. Displays, Inc.*, 532 U.S. 23 (2001); *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1117–18 (5th Cir. 1991).  "The plaintiff has the burden of proof on both of these issues." *CICCorp., Inc. v. AIMTech Corp.*, 32 F. Supp. 2d 425, 434 (S.D. Tex. 1998).  To be protectable under the first prong, the trade dress must be nonfunctional and either be inherently distinctive or have secondary meaning.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000).  The second prong, infringement, occurs where "the use creates a likelihood of confusion as to the 'source, affiliation, or sponsorship'" of the alleged infringer's product.  *Pebble Beach, Co. v. Tour 18 I Ltd. ("Pebble Beach II")*, 155 F.3d 526, 543 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices*, 532 U.S. 23 (citing 15 U.S.C. § 1125(a)(1)(A)).

### a. Protectable Trade Dress

### i. Nonfunctional

To prevail on a claim of trade dress infringement, a plaintiff must show that the allegedly infringing feature is not functional.  *Wal-Mart*, 529 U.S. at 210.  In *TrafFix*, the Supreme Court held that the traditional test of functionality is whether the product feature "is essential to the use

or purpose of the article or if it affects the cost or quality of an article."  532 U.S. at 32 (citing

*Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995)) (internal quotation marks

omitted).  "Under this traditional definition, if a product feature is 'the reason the device works,'

then the feature is functional.  The availability of alternative designs is irrelevant."  *Eppendorf-*

*Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002) (quoting *TrafFix*, 532

U.S. at 33–34).  The word "essential," as used in *TrafFix*, is a term of art; "[a] feature is essential

to the use or purpose of a product if it serves any significant function other than to distinguish a

firm's goods or identify their source."  *Poly-Am., L.P. v. Stego Indus., L.L.C.*, 3:08-CV-2224-G,

2011 WL 3206687, at *10 (N.D. Tex. July 27, 2011) (citing *Qualitex*, 514 U.S. at 165–66)

(internal quotation marks omitted).  *TrafFix* also recognized a second test for functionality in

aesthetic features: "a functional feature is one the 'exclusive use of which would put competitors

at a significant non-reputation-related disadvantage.'"  *TrafFix*, 532 U.S. at 24 (quoting *Qualitex*

*Co.*, 514 U.S. at 165).  However, "[w]here the design is functional under the [traditional]

formulation there is no need to proceed further to consider if there is a competitive necessity for

the feature."  *TrafFix*, 532 U.S. at 33.

The Fifth Circuit has recognized that, although functional features cannot be protected, an

arbitrary combination of functional features, "the combination of which is not itself functional,

properly enjoys protection."  *Taco Cabana*, 932 F.2d at 1119.  Other circuits, as well as district

courts in this circuit, have similarly recognized that individual functional features of a design

may still, as a combination, be deserving of trade dress protection.  *See Antioch Co. v. W.*

*Trimming Corp.*, 347 F.3d 150, 157–58 (6th Cir. 2003) (collecting cases from various circuits

recognizing this principle); *Kodiak Prods. Co. v. Tie Down, Inc.*, No. 4:03–CV–1474–Y, 2004

WL 2599353, at *4 n.2 (N.D. Tex. Nov. 12, 2004); *Chemlawn Servs. Corp. v. GNC Pumps,*

*Inc.*, 690 F. Supp. 1560, 1571 (S.D. Tex. 1988) ("The parts of the Chemlawn Gun were obviously designed to perform their particular functions; however, the specific exterior configuration was arbitrarily selected.  It was not necessary to copy the configuration of each of the parts of the Chemlawn gun in order to effectuate those functions."); *but see Berg v. Symons*, 393 F. Supp. 2d 525, 555 (S.D. Tex. 2005) ("Although '[a] unique combination of elements may make a dress distinctive, [ ] the fact that a trade dress is composed entirely of commonly used or functional elements might suggest that the dress should be regarded as unprotectible [sic] or 'generic,' to avoid tying up a product or marketing idea.'" (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 118 (2d Cir. 2001)).

Based on the foregoing, Cooper's argument that two functional features cannot, in combination, be nonfunctional, is contrary to established precedent.[2]   However, as explained in *Antioch*, "in order to receive trade dress protection for the overall combination of functional features, those features must be configured in an arbitrary, fanciful, or distinctive way." *Antioch*, 347 F.3d at 158 (citing *TrafFix*, 532 U.S. at 34).   "In other words, where individual functional components are combined in a nonarbitrary manner to perform an overall function, the producer cannot claim that the overall trade dress is non-functional." *Id.*; *see also Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999) ("[Plaintiff] is correct that trade dress must be viewed as a whole, but where the whole is nothing other than an

---

[2] In discussing the law on whether functional features may, in combination, be nonfunctional, the Court does not lend any stamp of approval to Cooper's framing of the black and yellow color scheme as a feature that is made up of two functional elements.  Cooper contends that the Court has held, as a matter of law, that black color of the support blocks is functional.  (Doc. No. 161 at 4.)  The Court has not so ruled.  In its Memorandum and Order on Cooper's Motion for Summary Judgment, the Court simply acknowledged that Cooper had put forward evidence that the black color was functional.  (Doc. No. 108 at 22.)  However, the Court then went on to note that Clearline was not contending that the black color, on its own, was a part of its trade dress.  (*Id.* at 23.)  While the Court never held that the black color either was or was not functional, the parties did appear to agree, at a conference held on the jury charge, that the functionality of the black color was "not in the case."  (Trial Tr. 1348:6–21.)  For the purposes of deciding Cooper's Motion for JMOL, the Court assesses whether the jury verdict may be upheld even assuming that the black color is functional.

assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is nonfunctional.").

Cooper contends that there was no evidence that the reflective yellow striping and black surface color were arranged arbitrarily.  (Doc. No. 161 at 5.)[3]  Cooper's argument that no evidence supports the jury's conclusion that, although the use of a yellow reflective stripe is functional, the overall yellow and black color scheme is not functional must be rejected.  Here, the jury could have concluded that although yellow reflective striping on a support block served a functional purpose, the yellow and black color scheme, as actually used, did not have a functional purpose.  For instance, the jury could have concluded that even though yellow reflective striping is functional, Clearline's particular arrangement of the yellow stripe on black material, one horizontal stripe on the side of the support block, was arbitrary.  Indeed, it is difficult to argue that how yellow striping is placed on black material is anything other than arbitrary.  Clearline could have put the yellow stripe vertically, horizontally, toward the top, toward the bottom, across the middle (as it did), it could have used two yellow stripes, it could have placed it on both sides, and so on, ad infinitum.[4]  The jury simply concluded, after

---

[3] Cooper also argues that any argument that the combination of yellow and black is protectable was dismissed at the summary judgment stage when the Court granted summary judgment as to claims of trade dress infringement based on the overall appearance of the C-PORT®.  (*See* Doc. No. 180 at 1–3.)  This is an inaccurate characterization of the Court's Memorandum and Order granting in part and denying in part Cooper's Motion for Summary Judgment.  The Court granted summary judgment on a claim that the overall appearance of Clearline's rooftop support products was protectable trade dress, but the overall appearance included the shape, the dimensions, and the color scheme and striping.  (Doc. No. 108 at 10, 13–15.)  The Court clearly considered the color scheme separately from the "overall appearance" trade dress infringement claim.  (*See id.* at 21–23.)  Although the Court indicated that it was denying summary judgment as to the functionality of the black and yellow color scheme because questions of fact remained as to the functionality of the yellow stripe, the Court never held that if the yellow stripe was found to be functional, no further assessment of the black and yellow color scheme would be necessary.  (*See id.* at 23.)  Clearline was entitled to put forward at trial evidence that the combination of the two features was non-functional.  Nothing in the Court's July 2, 2012 Memorandum and Order is to the contrary.

[4] The hypothetical arrangements of yellow and black are not presented as alternative designs, which the Court recognizes it may not consider under the traditional test.  *Eppendorf*, 289 F.3d at 355.  Rather, they are presented merely to clarify what the Court means when it says it is *how* a yellow stripe is placed on a black surface that

considering the demonstrative C-PORT® and DURA-BLOK™ and weighing the evidence of potential safety benefits of the yellow on black color schemes, that the *way* the yellow striping was combined with the black surface did not serve a functional purpose.

The Court is not convinced otherwise by the authority Cooper cites.  In *Eppendorf*, the Fifth Circuit specifically noted that the color scheme had a functional purpose: enabling users to clearly see and measure liquid in a syringe.  *Eppendorf*, 289 F.3d at 358.  The Court certainly does not quibble with the argument that two colors *may* combine to serve a joint functional purpose, as they did in *Eppendorf*.  But *Eppendorf* cannot be read as overruling clear language in *Taco Cabana* that an arbitrary combination of functional features, "the combination of which is not itself functional, properly enjoys protection."  *Taco Cabana*, 932 F.2d at 1119.  Similarly, the Court does not disagree that the overall appearance of a product is functional where the product is designed such that the individual features all also *work together* to provide functionality.  *See Antioch*, 347 F.3d at 159 (finding that the "other features of Antioch's album work *in sync* with the dual strap-hinge to provide the user with the advertised benefits") (emphasis added); *Leatherman*, 199 F.3d at 1013 (holding that where "the *arrangement and combination* of [functional] parts is designed to result in superior performance" there can be no claim for trade dress infringement based on the overall appearance of a product) (emphasis added).  Here, however, the jury was entitled to conclude that the functional features were not specifically arranged in a manner that provided added functionality, but were rather arranged arbitrarily.  Finally, the Court agrees that, in some cases, the combination of functional features results in a whole that is nothing more than the sum of its parts.  *See Tie Tech, Inc., v. Kinedyne Corp.*, 296 F.3d 778, 785–86 (9th Cir. 2002) (refusing to grant trade dress protection to the overall

---

matters.  The Court does not mean to suggest that it is the existence of these alternatives renders Clearline's combination non-functional.

appearance of a product where the overall appearance was merely a combination of the handle, rounded edges, and prong of a device designed to cut through wheelchair-securement webbing). However, when the combination for which protection is sought is a color scheme, the whole is not merely the sum of its parts; colors, unlike two entirely distinct functional features such as a handle and a rounded edge, must be combined in some particular manner.

Cooper also argues that it is entitled to judgment as a matter of law on the question of functionality because the yellow and black color scheme satisfies the secondary definition of functionality, competitive necessity.  Under the competitive necessity test, unlike under the traditional test, alternative designs are relevant.  *See Eppendorf*, 289 F.3d at 356, 358 (recognizing that the competitive necessity test discussed in *TrafFix* is "virtually identical" to the utilitarian test of functionality used in the Fifth Circuit prior to *TrafFix*, and noting that alternative designs, though not relevant to the traditional test, are relevant to the utilitarian test); *Kodiak*, 2004 WL 2599353, at *3 ("Only under [the competitive necessity] standard should a court review the possibility of alternative designs.").  Here, the jury was presented with ample evidence that alternative designs exist and compete in the field of rooftop support products. (*See, e.g.*, Trial Tr. 141:19–146:16.)  The jury could have concluded, on the basis of this evidence, that exclusive use of the particular yellow and black color scheme at issue would not put rooftop support block competitors at a significant non-reputation-related disadvantage.

### ii.    Secondary Meaning

To determine whether a trade dress has "secondary meaning," courts inquire into "the public's mental association between the mark and the alleged mark holder" to determine whether "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself."  *Bd. of Supervisors for La. State Univ. Agric. and Mech.*

*Coll. v. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir. 2008) (citing *Wal-Mart*, 529 U.S. at

211). "[T]he showing required is that consumers associate the trade dress with a single source,

even if the name of that source is unknown," at the time the alleged infringement began. 1

McCarthy on Trademarks and Unfair Competition § 8:8 (citation and internal quotation marks

omitted); *see also Pebble Beach, Co. v. Tour 18 I Ltd. ("Pebble Beach I")*, 942 F. Supp. 1513,

1559 (S.D. Tex. 1996), *aff'd as modified by* 155 F.3d 526, *abrogated on other grounds by*

*TrafFix*, 532 U.S. 23; *Natural Polymer Int'l Corp. v. S & M Nutec, LLC*, No.

Civ.A.3:03CV0461–P, 2004 WL 912568 at *6. (N.D. Tex. April 27. 2004); *Sugar Busters LLC*

*v. Brennan*, 177 F.3d 258, 269 n.8 (5th Cir. 1999). Courts in the Fifth Circuit consider a

combination of factors in this inquiry, including:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress.

*Pebble Beach II*, 155 F.3d at 543. These factors in combination may show that consumers

consider a mark to be an indicator of source even if each factor alone would not

prove secondary meaning. *Smack Apparel*, 550 F.3d at 476 (citing *Pebble Beach II*, 155 F.3d at

541). Whether a mark has acquired secondary meaning is a question of fact. *Amazing Spaces*,

608 F.3d at 234.

There is ample support for the jury's finding. Clearline presented evidence that it

emphasized its color scheme at trade shows. (*See* Trial Tr. 147:20–149:8.) Clearline also

presented evidence of sales volume and industry recognition as early as 2003. (*See, e.g.*, Trial

Tr. 148:11–149:8, 161:13–19.) The jury could have extrapolated that sales were made at least in

part because of Clearline's color scheme branding at popular trade show booths. (*See* Trial Tr.

147:20–149:19.) *Cf. Amazing Spaces*, 608 F.3d at 249 (noting that volume of sales was not

probative because plaintiff attempted to attract customers using other marks).  Plaintiff also put forward evidence of substantial spending on advertising which clearly depicted the yellow and black color scheme.  (*See* Trial Tr. 150:2–10; Pl.'s Exs. 198, 200.)  While Cooper presents some case law from other circuits suggesting that advertising is only relevant to the extent it "encourages consumers to look for particular features as indicative of origin," *see Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 44–45 (1st Cir. 2001), there is no such cabined reading of the advertising factor in the Fifth Circuit.  Plaintiff also presented evidence of Cooper's customers directly contacting Clearline, without instructions from Cooper to do so.  (*See, e.g.*, Pl.'s Exs. 59, 60; Peeler Dep. 182:10–17, 183:18–186:4, 192:5–193:17.)  This evidence does not directly prove that customers contacted Clearline because of the black and yellow color scheme on the products Cooper was selling; however, the Court does not believe it must.  The jury was free to infer, in light of the totality of the evidence, that Cooper's customers contacted Clearline because they associated the black and yellow color scheme with Clearline.  Finally, although survey evidence is admittedly the preferred evidence of secondary meaning, *Amazing Spaces*, 608 F.3d at 248, the jury was presented with more than a scintilla of evidence on the other factors from which it was entitled to conclude that Clearline's yellow and black color scheme had acquired secondary meaning.

### b.   Infringement

Trade dress infringement occurs where "the use creates a likelihood of confusion as to the 'source, affiliation, or sponsorship'" of the alleged infringer's product.  *Pebble Beach II*, 155 F.3d at 543 (citing 15 U.S.C. § 1125(a)(1)(A)).  "'Likelihood of confusion' means more than a mere possibility; the plaintiff must demonstrate a probability of confusion."  *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009).  Courts "examine the following

nonexhaustive 'digits of confusion' in evaluating likelihood of confusion: (1) the type of trademark; (2) mark similarity; (3) product similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers." *Id.* at 227. "No digit is dispositive, and the digits may weigh differently from case to case, depending on the particular facts and circumstances involved." *Id.* (quotation marks omitted). "[L]ikelihood of confusion is typically a question of fact." *Id.*

Cooper raises the same argument for infringement as it did for functionality: the jury's finding that Cooper's use of the reflective yellow stripe did not create a likelihood of confusion mandates the conclusion that Cooper's use of the black and yellow color scheme also could not have created a likelihood of confusion. However, just as the jury could have concluded that, although the yellow stripe was functional, the particular black and yellow color scheme was not, the jury also could have concluded that, while the yellow stripe on Cooper's product did not, alone, create a likelihood of confusion, the overall black and yellow color scheme used by Cooper did. There is no inconsistency in such a conclusion and a new trial is not warranted. Furthermore, the jury was presented with ample evidence as to the relevant factors to consider for infringement.

### 2. Willfulness as to Trade Dress Infringement

A defendant is liable for willful infringement if he acts "voluntarily and intentionally and with the specific intent to cause the likelihood of consumer confusion . . . , to cause mistake or to deceive." *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 349 n.9 (5th Cir. 2002) (citations and internal quotations omitted). "Intent to compete, however, is not tantamount to intent to confuse." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 486 (5th Cir. 2004).

Here, the jury was presented with evidence that Cooper selected the yellow reflective stripe and the black recycled rubber because of independent functional and aesthetic reasons. (*See* Trial Tr. 670:16–24, 845:5–846:17, 851:7–852:16, 896:15–897:3.)  However, it was also presented with evidence that Cooper sent sample C-PORT® products to its manufacturer, sought to make a product that would "look similar" and "still have all of the same features" as the C-PORT®, and even tried, initially, to have the yellow stripe painted onto the recycled rubber, like Clearline.  (Pl.'s Ex. 77; *see also* Pl.'s Ex. 21; Trial Tr. 498:1–506:25, 650:17–651:24, 653:18–655:8, 668:18–671:16, 727:23–728:10.)  Weighing such competing evidence is the province of the jury.  The jury could have determined that a preponderance of the evidence here supported a finding that Cooper's desire to create a product with such a similar look evinced intent to confuse, and not simply an intent to compete.  Judgment as a matter of law is inappropriate.

### 3.    Trade Dress Infringement Remedies

Prevailing plaintiffs in trade dress infringement cases may recover under 15 U.S.C. § 1117(a), which provides that a "plaintiff shall be entitled. . . subject to the principles of equity . . . to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . Such sum . . . shall constitute compensation and not a penalty."  15 U.S.C. § 1117(a).  *See also Taco Cabana*, 932 F.2d at 1126.  Although the Lanham Act "itself is no obstacle to a recovery of both plaintiff's damages and defendant's profits[,] . . . damages and profits cannot be awarded simultaneously if it would result in over-compensation."  1 McCarthy on Trademarks and Unfair Competition § 30:73; *see also GTFM, Inc. v. Solid Clothing Inc.,* No. 01 Civ. 2629(DLC), 2002 WL 31886612, at *6 (S.D.N.Y. Dec. 27, 2002); *Holiday Inns, Inc. v. Airport Holiday Corp.*, 493 F. Supp. 1025, 1028 (N.D. Tex. 1980), *aff'd*, 683 F.2d 931 (5th Cir. 1982).  "An award of the defendant's profits is not automatic, and is committed to the discretion

of the district court, whose decision [is reviewed] for an abuse of discretion."  *Pebble Beach II*, 155 F.3d at 554 (citations omitted).

Here, the jury was properly instructed that it could not include in its award of Cooper's profits any amount already included in its calculation of Clearline's lost profits.  Plaintiff's expert explained that his calculation method removed any duplicative damages, but took into account the extent to which Cooper was unjustly enriched by, for instance, purchasing materials from a cheaper supplier.  (Trial Tr. 979:1–980:9.)  Although Cooper put forward its own expert, who questioned the propriety of including both lost profits and profit disgorgement premised on the same sales (*see* Trial Tr. 1221:16–1223:5), the jury was entitled to credit the testimony of Plaintiff's expert.  Cooper has not shown that the jury's award constitutes an impermissible double recovery for Clearline.

### a.        Clearline's Lost Profits

Proof of damages in a trademark and trade dress action is governed by the law of damages of tort actions.  1 McCarthy on Trademarks and Unfair Competition § 30:72; *see also Broan Mfg. Co., Inc. v. Associated Distribs., Inc.*, 923 F.2d 1232, 1235 (6th Cir. 1991).  As a general rule, "damages are not permitted which are remote and speculative in nature."  *Broan*, 923 F.2d at 1235 (citations omitted).  "This rule serves to preclude recovery, however, only where the *fact* of damage is uncertain, *i.e.*, where the damage claimed is not the certain result of the wrong, not where the *amount* of damage alone is uncertain."  *Id.* (citations omitted) (emphasis in original).  "Thus, although to set a damage figure arbitrarily or through pure guesswork is impermissible, [o]nce the existence of damages has been shown, all that an award of damages requires is substantial evidence in the record to permit a factfinder to draw reasonable inferences

and make a fair and reasonable assessment of the amount of damages." *Id.* at 1236 (citations and internal quotation marks omitted).

Cooper argues that Clearline presented no evidence that Cooper would have continued its relationship with Clearline.  It contrasts this case with *Broan*, where the plaintiffs were never advised that the relationship was under review, and both parties expected a long term relationship. *See Broan*, 923 F.3d at 1237–38.  Here, in contrast, Cooper submitted evidence that it was dissatisfied with the relationship, particularly with Clearline's level of supply, and that Clearline was aware of Cooper's dissatisfaction.  (Trial Tr. 245:7–253:22, 833:11–834:6, 843:1–14, 899:15–20.)  However, Clearline also presented evidence that it was working to address the backlog, that some improvement had been made, and that Cooper recognized that product flow had improved.  (Trial Tr. 443:18–447:4.)  *Broan* itself acknowledges that "[s]ome uncertainty regarding what might have happened in the absence of the copying scheme is not fatal." *Broan*, 923 F.2d at 1237.  The jury was entitled to conclude from the competing evidence that Clearline had established the fact that it suffered lost profits as a result of infringement to a reasonable degree of certainty.  *See id.* ("Broan must establish the fact of damages with *reasonable,* not absolute, certainty.").

Cooper's argument that the amount of lost profits awarded lacks any support in the record must also be rejected.  The jury was entitled to weigh competing expert testimony and evidence in the record about Clearline's supply capabilities, the likelihood that the relationship between Cooper and Clearline would continue, the profits Clearline made selling to other customers, and other relevant evidence put forward by the parties, and draw reasonable inferences in assessing Clearline's lost profits.  There is nothing patently unreasonable about the jury's conclusion to award about half of what Clearline's expert calculated to be Clearline's lost profits.

### b.    Cooper's Profits

A plaintiff who proves infringement may be entitled to a defendant's profits, to the extent they are attributable to the defendant's unlawful use of plaintiff's trade dress or trademark.  15 U.S.C. § 1117(a); *see also Pebble Beach II*, 155 F.3d at 554–55.  An award of profits is not automatic, but discretionary.  *See Pebble Beach II*, 155 F.3d at 554.  The factors to be considered in determining whether to award defendant's profits

> include, but are not limited to (1) whether the defendant had the intent to confuse
> or deceive, (2) whether sales have been diverted, (3) the adequacy of other
> remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5)
> the public interest in making the misconduct unprofitable, and (6) whether it is a
> case of palming off.

*Quick Technologies*, 313 F.3d at 349 (citations and internal quotation marks omitted).

"In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a).  Thus, the burden is on the infringer "to prove (1) which, if any, of those sales were not attributable to the wrongful act, and (2) deductible costs and expenses to arrive at net profits."  1 McCarthy on Trademarks and Unfair Competition § 30:66 (citation and internal quotation marks omitted).  The principle was established decades ago by the Supreme Court, and it remains the law of the land.  *See Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 206–07 (1942) ("The burden is the infringer's to prove that his infringement had no cash value in sales made by him.  If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark."); *see also Venture Tape Corp. v. McGills Glass Warehouse*, 540 F.3d 56, 64 (1st Cir. 2008); *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d

595, 606–07 (6th Cir. 1991); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 518 (9th Cir. 1985).

Cooper argues that it is Clearline who must prove that that Cooper's profits are attributable to its infringement.  In support of this argument, Cooper cites *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 772 (2d Cir. 1984), *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir. 1994), *Pebble Beach II*, 155 F.3d at 554–55, and *Quick Technologies*, 313 F.3d at 350.  *Burndy* does state that the burden is on the plaintiff to prove that a defendant's sales were attributable to its infringing use of plaintiff's trademark.  *Burndy*, 748 F.2d at 772. However, this statement is contrary to the language of the Lanham Act, Supreme Court precedent, and the majority of circuit precedent.  This Court declines to follow *Burndy*.  *Badger Meter*, *Pebble Beach II* and *Quick Technologies* are all silent as to who bears the burden of proving whether a defendant's profits are attributable to infringement.  None of these cases controverts the well-established principle that profits may be presumed to be attributable to infringement unless the defendant proves otherwise.

Cooper's argument that the amount of its profits Clearline was awarded lacks any support in the record must also be rejected.  This argument lacks merit for the same reason Cooper's argument as to the amount of Clearline's lost profits lacks merit.  The jury was entitled to consider Clearline's expert's calculation of Cooper's profits, Cooper's evidence of other factors that contributed to its profits, the amount of profits already accounted for in its award of Clearline's lost profits, and any other relevant evidence put forward by the parties, and determine what amount of Cooper's profits was an appropriate award.  *See Pipitone v. Biomatrix*, 288 F.3d 239, 250 (5th Cir. 2002) (holding that jury was entitled to consider expert's testimony and the predicate facts, and determine for itself how much weight to accord the expert's opinion);

*Grenada Steel Indus., Inc. v. Ala. Oxygen Co., Inc.*, 695 F.2d 883, 889 (5th Cir. 1983) (jury was entitled to credit or discredit one or more expert opinions).

### 4.    Trademark Infringement

To prevail on a claim of trademark infringement, a plaintiff must show that a defendant's use of plaintiff's trademark is "likely to cause confusion among consumers as to the source, affiliation, or sponsorship of [defendant's] products or services." *Scott Fetzer Co.*, 361 F.3d at 483 (citations and internal quotation marks omitted).  "A likelihood of confusion means that confusion is not just possible, but probable." *Id.* (citation and internal quotation marks omitted); *Smack Apparel*, 550 F.3d at 478.  In determining whether a likelihood of confusion exists, the Fifth Circuit considers the following "'digits of confusion': (1) the type of trademark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of the retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; (7) any evidence of actual confusion; and (8) the degree of care exercised by potential purchasers." *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 532 (5th Cir. 2012) (citations omitted).  "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these digits of confusion." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998) (citations and internal quotation marks omitted).

Here, Cooper does not dispute that it used an identical mark in its tradeshow catalogue. For that reason alone, the jury's finding of a likelihood of confusion has sufficient support in the record.  *See* 1 McCarthy on Trademarks and Unfair Competition § 23:20 (noting that cases where a defendant uses an identical mark are "open and shut").  Cooper's argument that tradeshow catalogues are not a wide-reaching mode of advertising is entirely inapposite.  The

identity of the advertising media used is relevant to the extent that defendant uses similar ads, in similar media, to target the same audience.  *See MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, 416 (D.N.J. 2008) (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 722 (3d Cir. 2004)).  Cooper has cited no case law standing for the proposition that use of limited advertising to reach only a particular audience (here, attendees of trade shows) warrants ruling, as a matter of law, that there is no likelihood of confusion.

### C.     Clearline's Motion for JMOL (Doc. No. 160)

Clearline seeks JMOL arguing that:  1) Clearline has shown that it is entitled to the full amount of damages requested related to infringement of its trade dress; 2) Clearline has shown that it is entitled to the full amount of damages requested related to trademark infringement; and 3) Clearline has shown that Cooper infringed on its trademark in Cooper's website code.  The first two points are addressed together.

### 1.     Damages

Clearline argues that it is entitled to the full amount of damages requested because Cooper did not meet its burden to show that some of Cooper's profits were not attributable to infringement.  Cooper reiterates the arguments it raised in support of its own JMOL as to the inadequacy of Plaintiff's damages evidence.  It also points out that it presented evidence showing that its sales of the DURA-BLOK™ may have been attributable to various other factors aside from the infringing color scheme, including existing customer relationships, complementary products, increased production capacity, and other features of the DURA-BLOK™.  (Trial Tr. 1212:11–1213:21.)

Cooper's arguments about the inadequacy of Clearline's damages evidence have already been addressed, and need not be rehashed.  As explained *supra* Part II.B.3, the jury was entitled to weigh competing evidence regarding Clearline's lost profits, and Cooper, not Clearline, had the burden to show that not all of Cooper's profits were attributable to infringement.  However, Clearline's Motion for JMOL on this point must also be denied.  Just as the jury was entitled to credit the testimony of Plaintiff's expert as to damages, it was also entitled to credit the evidence Cooper put forth showing that some of Cooper's profits were the result of other factors and to discount Plaintiff's expert's conclusions that Clearline suffered damages as a result of trademark infringement.  *See Pipitone*, 288 F.3d at 250; *Grenada*, 695 F.2d at 889.

### 2.    Trademark infringement

Clearline also seeks judgment as a matter of law that Cooper infringed on Clearline's trademark by using its mark in Cooper's website code.  As explained *supra* Part I, with regard to Cooper's use of Clearline's C-PORT® trademark in its website code, Clearline claimed only that Cooper infringed on its trademark by using the mark in meta-tags.  Record evidence indicates that Cooper used the C-PORT® mark in its alt-tags only, and not in its meta-tags.  *See supra* Part I.B.  Because the evidence is legally sufficient to uphold the jury's verdict on the claim before it, and because, as explained *supra* Part I, Clearline is not entitled to amend its pleadings to put forth a different claim, judgment as a matter of law is inappropriate.

## III.    ENHANCED DAMAGES

### A.    Legal Standard

A district court has "considerable discretion in fashioning an appropriate remedy for infringement" under the Lanham Act.  *Taco Cabana*, 932 F.2d at 1127.  The statute provides that "[i]n assessing damages the court may enter judgment, according to the circumstances of the

case, for any sum above the amount found as actual damages, not exceeding three times such amount. Such sum . . . shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a). "An enhancement of damages may be based on a finding of willful infringement, but cannot be punitive." *Taco Cabana*, 932 F.2d at 1127; *see also Champion Cooler Corp. v. Dial Mfg.*, No. 3:09–CV–1498–D, 2010 WL 1644193, at *3 (April 22, 2010) (noting that "evidence of willfulness alone, without proof that damages are not completely compensatory, does not entitle a plaintiff to enhanced damages").

Enhancement is appropriate where the damages awarded fail to adequately compensate a plaintiff. *Taco Cabana*, 932 F.2d at 1127. The Fifth Circuit has recognized "[i]t is anomalous to say that an enhancement of damages, which implies an award exceeding the amount found 'compensatory,' must be 'compensatory' and not 'punitive.'" *Id.* It has further explained that one appropriate use of the judicial power to enhance compensatory damages would be to "provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice, particularly where the imprecision results from defendant's conduct." *Id.*

## B. Analysis

Clearline seeks enhanced damages, arguing that the jury's award does not reflect the full $12,866,718 in damages calculated by its expert. It also points to Neil Krovatz's testimony cataloguing the financial difficulties Clearline faced as a result of Cooper's infringement, and the effect those difficulties had on Clearline's ability to compete. (Trial Tr. 176:24–178:17.)

The Court does not find an award of enhanced damages warranted. First, as explained *supra* Part II.C.1, the record contains evidence that would justify the jury's decision to award less than the full amount of damages Clearline requested. The Court sees no reason to question

the jury's weighing of competing expert calculations, and other evidence probative of the likelihood and extent of a continued relationship between Cooper and Clearline.  Furthermore, this is not a case where damages calculations are imprecise because of stonewalling by Cooper.  *Taco Cabana*, 932 F.2d at 1127; *see also Neles-Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 983 n.8 (S.D. Tex. 1997) (declining to enhance damages, and noting that "there is no indication that any imprecision was a result of Defendants' conduct").  Finally, while *Taco Cabana* does not bar a court from enhancing damages when the imprecision stems from something other than a defendant's obstruction, this Court declines to use its discretion to further enhance an already substantial damages award based on nothing more than Plaintiff's own assertions that he suffered additional, un-quantified damages.

## IV.    SUPPLEMENTAL DAMAGES

In its Motion for Supplemental Damages, Clearline seeks supplemental actual damages for Cooper's continued sales of the DURA-BLOKs™ after the adverse jury verdict.  Clearline requests that Cooper be ordered to provide its sales numbers from October 5, 2012, the date of the verdict, to the present.  Cooper has refused to do so to date.  Clearline also requests that the Court award supplemental actual damages to Clearline, and enhance those damages based on Cooper's willful continued infringement.

Neither the parties, nor this Court, could find any case law under the Lanham Act addressing the question of supplemental damages for the continuing sale of infringing products post-verdict.  However, both parties agree that patent case law has addressed this question.  Patent law has recognized that awarding supplemental damages for post verdict infringement is appropriate and, indeed, required.  *See, e.g.*, *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365,

1384 (Fed. Cir. 2013); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212–13 (Fed. Cir. 2010).

> The provision governing damages in patent cases provides as follows:
>
> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement . . . together with interest and costs as fixed by the court.
>
> When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

35 U.S.C. § 284.  This provision appears, at first glance, rather similar to the Lanham Act's damages provision.  *See* 15 U.S.C. § 1117(a) (providing for compensatory damages and leaving district courts with discretion to award up to three times the amount of damages assessed by a jury).  Notably, however, § 284 does not contain the prohibition on punitive damages that exist in the Lanham Act.  *See* 15 U.S.C. § 1117(a) (providing that damages awarded under the Lanham Act "shall constitute compensation and not a penalty").  Accordingly, the second paragraph of § 284 has been understood to allow a district court discretion to award enhanced damages as a *penalty* for willful infringement.  *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996) (noting that § 284 provides for punitive damages); *Beatrice Foods Co. v. New England Printing and Lithographing Co.*, 923 F.2d 1576, 1579 (Fed. Cir. 1991) ("Under our cases, enhanced damages may be awarded only as a penalty for an infringer's increased culpability, namely willful infringement or bad faith.").  This, of course, is directly contrary to how the Fifth Circuit has interpreted the Lanham Act provision allowing a court to "enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount."   15 U.S.C. § 1117(a); *see Taco*

*Cabana*, 932 F.2d at 1127 (recognizing that enhancement is appropriate only where the damages awarded fail to adequately compensate a plaintiff).

Despite this important difference, the Court agrees with Clearline that patent law provides useful guidance on the question of whether to award supplemental damages for post-verdict infringement.   This is because patent case law makes clear that supplemental damages for post-verdict infringement are required *as compensation*.  *See Finjan*, 626 F.3d at 1212–13 (recognizing that a patentee is not "fully compensated" unless the damages award includes sales following the verdict); *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009) (noting that "[a] damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for post-verdict sales").

The Court concludes that the above case law supports some award of damages for the post-verdict sales.  However, at this time, there is no evidence in the record as to the amount of post-verdict sales.  Accordingly, the Court declines, at this stage, to determine the appropriate formula for determining what proportion of Cooper's post-verdict sales Clearline is entitled to, and whether the supplemental damages ought to be enhanced because Cooper's post-verdict infringement was allegedly willful.  The Court orders Cooper to produce to Clearline, within fifteen days, its post-verdict sales figures of DURA-BLOKs™.  Parties are expected to engage in any discovery necessary to accurately determine the damages Clearline incurred from post-verdict sales of DURA-BLOKs™.   The Court encourages parties to attempt to reach an agreement on an appropriate supplemental damages award.  If parties cannot reach an agreement, however, Clearline should re-file its Motion for Supplemental Damages within forty-five days and include briefing on the appropriate method of calculating damages stemming from post-

verdict sales.   The Court will evaluate whether an evidentiary hearing is necessary upon reviewing the parties' filings.

## V.      INTEREST

### A.      Legal Standard

Pre-judgment interest is not provided for in 15 U.S.C. § 1117(a).  *Am. Honda Motor Co., Inc. v. Two Wheel Corp.*, 918 F.2d 1060, 1064 (2d Cir. 1990).  Circuits that have spoken on the issue do agree that trial courts may award pre-judgment interest in trademark and trade dress infringement cases.  *See* 1 McCarthy on Trademarks and Unfair Competition § 30:93 (collecting cases).  However, circuit courts have reached very different conclusions as to when an award of pre-judgment interest is appropriate.   The Seventh and Tenth Circuits have held, in analyzing claims under the Lanham Act, that "prejudgment interest should be presumptively available to victims of federal law violations.  Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay."  *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989); *see also United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1236–37 (10th Cir. 2000).  In contrast, the Second Circuit has held that pre-judgment interest is to be reserved for "exceptional" cases.  *Am. Honda*, 918 F.2d at 1064.  In so holding, it provided no explanation as to why this rule is desirable.  *See id.*  The Eighth Circuit has simply held that a "district court has discretion to deny prejudgment interest in Lanham Act cases."  *EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 743 (8th Cir. 2000).  The Fifth Circuit has not spoken on the question of when pre-judgment interest ought to be awarded for violations of the Lanham Act.  The Court is aware of at least one district court in Texas that has awarded pre-judgment interest to a prevailing party in a trademark infringement case.  *See ErgoBilt, Inc. v.*

*Neutral Posture Ergonomics, Inc.*, No. Civ.A. 397CV2548L, 2004 WL 1041586, at *11 (N.D. Tex. May 6, 2004).[5]

### B.    Analysis

Clearline requests both pre-judgment interest and post-judgment interest on its entire damages award, and on any attorneys' fees awarded.  Specifically, Clearline seeks pre-judgment interest in the amount of five percent.  It seeks post-judgment interest at the rate provided for in 28 U.S.C. § 1961(a).  Cooper argues the Court should not award pre-judgment interest because the jury was already instructed to make Clearline whole with its lost profit award.  Cooper also argues that pre-judgment interest should be awarded only in exceptional cases, citing *Gorenstein* and *American Honda.*  Cooper then argues that, even if pre-judgment interest is awarded, it should only be awarded for Clearline's lost profits, not for Cooper's profits.  Cooper also disputes the five percent interest rate, arguing that a pre-judgment interest rate of 3.35 percent is appropriate.  Finally, Cooper does not dispute that, if post-judgment interest is awarded, it should be in accordance with 28 U.S.C. § 1961(a).

Cooper's assertion that the jury may have already awarded pre-judgment interest is specious.  The jury was never instructed to consider interest, and there is no suggestion that it did.  Carrying Cooper's argument to its logical conclusion, pre-judgment interest should never be awarded by a court, unless a jury was specifically instructed *not* to consider interest.  The Court declines to adopt such a position.

As explained *supra* Part V.A, there is no settled rule as to what circumstances justify an award of pre-judgment interest.  The circuits have taken a variety of approaches, none of which

---

[5] One other district court has held that pre-judgment interest is inappropriate because 15 U.S.C. § 1117(a) does not provide for it.  *See Neles-Jamesbury*, 974 F. Supp. at 983.  This position goes against all circuit precedent, and the Court declines to follow *Neles-Jamesbury* on this point.  *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992) (noting that no court of appeals has accepted the argument that "the Lanham Act's silence means that prejudgment interest is not available in an action for infringement under the Act").

is binding on this Court.  Accordingly, the Court has some latitude in fashioning an appropriate rule as to when pre-judgment interest should be awarded.  The Court is persuaded by the Seventh Circuit's reasoning that pre-judgment interest should be awarded in most cases.  *Gorenstein*, 874 F.2d at 436.[6]  Where a plaintiff proves lost profits, pre-judgment interest ought to be awarded as a matter of course; but for the infringement, the plaintiff would have had his lost profits, and interest from being able to invest those profits.  However, the Court is convinced by Cooper's argument that such interest should not be provided for any amount of *Cooper's* profits the jury awarded.  But for the infringement, Clearline would not have possessed any portion of Cooper's profits that was not duplicative of its own lost profits.  For instance, but for infringement, Clearline would not have enjoyed the profits Cooper earned as a result of using a cheaper supplier.  (*See* Trial Tr. 979:1–980:9.)  Accordingly, it has suffered no lost opportunity cost with regard to Cooper's profits.  The Court is not persuaded by Clearline's citation to 28 U.S.C. § 1961(a) in support of its argument that it is entitled to interest on all damages.  28 U.S.C. § 1961(a) provides the applicable rule for post-judgment interest; in that context, interest should, of course, be "allowed on any money judgment in a civil case."  28 U.S.C. § 1961(a).  Accordingly, Clearline is entitled to pre-judgment interest only on the jury's award of lost profits.

Clearline and Cooper disagree as to the appropriate rate to be used in calculating pre-judgment interest.  Clearline states that the average prime rate from the date of accrual of the claim to the date its motion was filed was five percent.  Clearline's assertion is contradicted by

---

[6] Cooper argues that *Gorenstein* also provides that pre-judgment interest is only appropriate in cases where the infringement was willful.  While *Gorenstein* does note that an award of pre-judgment interest was especially appropriate in that case because the violation was "intentional, and indeed outrageous," it never suggests that pre-judgment interest should be limited to those cases.  *Gorenstein*, 874 F.2d at 436.  *Gorenstein* could not be clearer in holding that pre-judgment interest should be generally available.  *Id.* ("The time has come, we think, to generalize, and to announce a rule that prejudgment interest should be presumptively available to victims of federal law violations.").

the prime interest rates it itself provides. (*See* Doc. No. 155 at 3 (indicating that the prime interest rate was five percent in May 2008 and 3.25 percent at the time Clearline filed its motion).) It also argues, in the alternative, that the Court may use, instead of the prime interest rate, the rate Cooper paid for unsecured loans, and urges the Court to presume that rate was five percent, because Cooper has provided no evidence to the contrary. Clearline also asks this Court to use its discretion to compound the interest rate at least annually. If the Court does award interest, Cooper does not disagree with using the prime interest rate, but points out that Clearline's proposed rate is inaccurate and lists its own prime interest rate figures throughout the relevant time period.

The *Gorenstein* court advised district courts to use the prime rate for fixing pre-judgment interest cases where no statutory interest rate governs. *Gorenstein*, 874 F.2d at 436. The prime interest rate "is a readily ascertainable figure which provides a reasonable although rough estimate of the interest rate necessary to compensate plaintiffs not only for the loss of the use of their money but also for the risk of default." *Id.* The *Gorenstein* court recognized, however, that while the prime rate is convenient, "a more precise estimate would be the interest rate paid by the defendant for unsecured loans." *Id.* at 437. While *Gorenstein* certainly allows a district court to use the interest rate paid by a defendant for unsecured loans, the Court declines Clearline's invitation to assume what rate Cooper paid without any evidence. Pre-judgment interest will be awarded in the amount of the average prime rate from the time Clearline's infringement claims accrued, in May 2008, until the date judgment is entered. The Court anticipates entering final judgment the week parties reach an agreement on supplemental damages, or, if no agreement is reached, the week the Court determines the amount of supplemental damages.

The Court further believes that compounding the interest would more closely return Plaintiff to its position absent infringement.  After all, returns on an investment may be reinvested and earn further returns.  Accordingly, the Court uses its discretion to order that the pre-judgment interest be compounded annually.  *Gorenstein*, 874 F.2d at 437.

The Court is somewhat baffled by the parties' apparent disagreement as to the average prime rate, an easily ascertainable fact.  Rather than providing unsupported assertions of the prime rate at random intervals between May 2008 and May 2013, the parties should review the detailed historical data available from the Federal Reserve regarding the prime rate.  Once the remaining issue of supplemental damages is resolved, the parties will be expected to consult http://www.federalreserve.gov/releases/h15/data.htm to determine the average prime rate from May 2008 until the date of final judgment.  The parties then will be required to submit an agreed proposal detailing the prime rate during the relevant time period and calculating the dollar amount of pre-judgment interest Clearline is owed based on the foregoing.

Finally, Clearline will be entitled to post-judgment interest as provided in 28 U.S.C. § 1961 on the full amount of the money judgment "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of judgment."  28 U.S.C. § 1961.  The applicable weekly average 1-year constant maturity Treasury yield should be determined by consulting http://www.federalreserve.gov/releases/h15/current/default.htm.  The determination will be made when the Court enters final judgment.

## VI.    PERMANENT INJUNCTION

### A.    Legal Standard

To be entitled to a permanent injunction under the Lanham Act, a party must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Flowserve Corp. v. Hallmark Pump Co.*, 2011 WL 1527951, at *9 (S.D. Tex. Apr. 20, 2011) (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Some courts have suggested that a finding of likelihood of confusion can satisfy the irreparable harm requirement. *See Phillip Morris USA Inc. v. Lee*, No. P-05-CA-0490-PRM, 547 F. Supp. 2d 667, 680 (W.D. Tex. 2008); *Coach, Inc. v. Brightside Boutique*, No. 1:11-CA-2-, 2012 WL 32941, at *6 (W.D. Tex. Jan 6, 2012) (collecting cases). Fifth Circuit precedent on this point is conflicting. In *Paulsson Geophysical Services, Inc. v. Sigmar*, the Fifth Circuit explicitly declined to "decide whether a court may presume irreparable injury upon finding a likelihood of confusion in a trademark case." 529 F.3d 303, 312–13 (5th Cir. 2008). It noted that the Supreme Court's decision in *eBay, Inc. v. MercExchange, L.L.C.* rendered this a complicated question. *Id.* In *eBay*, the Supreme Court rejected any bright line rule that a finding of patent infringement entitled a party to an injunction. *eBay*, 547 U.S. at 393–94. The Court's decision in *eBay* concluding that a finding of patent infringement does not automatically entitle a patentee to an injunction certainly casts doubt on prior case law suggesting that trademark or trade dress infringement constitutes irreparable injury as a matter of law. *See* Aurelia Hepburn-Briscoe, Comment, *Irreparable Harm in Patent, Copyright, and Trademark Cases After* eBay v. Mercexchange, 55 How. L.J. 643, 668–73 (2012). However, more recently, the Fifth Circuit indicated that presuming irreparable injury Lanham Act cases remains appropriate. *Abraham v.*

*Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) (citing 1 McCarthy on Trademarks and Unfair Competition § 30:2) ("All that must be proven to establish liability and the need for an injunction against infringement is the likelihood of confusion—injury is presumed.").

These conflicting precedents make a district court's determination as to the propriety of an injunction in a variety of intellectual property cases more difficult than it perhaps once was. Nonetheless, certain principles provide valuable guideposts. Where the infringement involves direct competitors, a finding of irreparable harm may well be appropriate. *See z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 440 (E.D. Tex. 2006). Continuing infringement, even after an adverse verdict, is surely sufficient to show inadequacy of remedies at law. 1 McCarthy on Trademarks and Unfair Competition § 30:2 ("If an injunction were denied, the court would be telling plaintiff to sit by and watch defendant continue to violate the law and infringe upon plaintiff's rights until such time as plaintiff decided to sue again for money damages as compensation for the past injury incurred."). In contrast, a trial court has substantial discretion to deny an injunction where infringement was inadvertent and is not likely to recur. *See, e.g.*, *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 207 (7th Cir. 1982); *In re Circuit Breaker Litig.*, 860 F. Supp. 1453, 1456 (C.D. Cal. 1994). Where a district court does issue an injunction, it has substantial discretion to tailor the injunction in light of the equities. *See* 1 McCarthy on Trademarks and Unfair Competition § 30:3 (collecting cases where the courts have allowed defendants to use infringing marks with a disclaimer, and allowing defendants to sell off existing stock). If the infringement was willful, however, a court does not have to balance the hardships. *United States v. Marine Shale Processors*, 81 F.3d 1329, 1358–59, 1359 n.16 (5th Cir. 1996); *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1333–34 (7th Cir. 1977). Finally, the "public interest is always served by requiring compliance with Congressional

statutes such as the Lanham Act and by enjoining the use of infringing marks." *Quantum Fitness Corp. v. Quantum LifeStyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 832 (S.D. Tex. 1999); *see also T-Mobile USA Inc. v. Shazia & Noushad Corp.*, No. 3:08–CV–00341, 2009 WL 2003369, at *4 (N.D. Tex. July 10, 2009).

### B.    Analysis

Clearline argues that it is entitled to a permanent injunction enjoining Cooper from using a yellow and black color scheme because Cooper continues to sell the infringing products to this day.  Cooper does not address the factors for injunctive relief, and instead merely argues that Clearline did not succeed on the merits of its trade dress claims.  The Court has already rejected this argument *supra* Part II.B.1.  Clearline also argues that it is entitled to a permanent injunction barring Cooper from using the C-PORT® mark.  Cooper argues that this would be unwarranted because it has not threatened to continue its accidental use of Clearline's trademark.

This record supports a finding of irreparable harm from Cooper's use of an infringing black and yellow color scheme.  The jury found likelihood of confusion, and here, Clearline and Cooper are direct competitors.  At the time Clearline filed its motion, Cooper's website continued to advertise the black and yellow DURA-BLOKs™.  (Doc. No. 157-1 ¶ 4.) Furthermore, at oral argument, Cooper admitted that it continued to sell the infringing DURA-BLOKs™ to this day.  Cooper's sales of its infringing rooftop support products have continued to exclude Clearline from reaching certain customers, supporting a finding of irreparable harm. *See z4*, 434 F. Supp. 2d at 440.  Furthermore, this is a clear case where remedies at law are inadequate.  Cooper has continued to sell the DURA-BLOKs™ despite a jury verdict against it. Denying Clearline an injunction would leave it in the untenable position of continuously suing for past damages.

One factor weighing somewhat against issuing a permanent injunction is Cooper's apparent intention to transition, in the very near future, to a different color scheme. Clearline alerted the Court that, in an April 19, 2013 email blast to its distributors, Cooper announced that it was switching to a red and black color scheme on its DURA-BLOKs™. (See Doc. No. 192-1.) At oral argument, Cooper confirmed that it would be introducing the new color scheme sometime around June 10, 2013. "It is within the discretion of the trial court to grant or deny an injunction against conduct which has ceased and is not likely to recur." *See, e.g.*, *Schutt*, 673 F.2d at 207; *K&G Men's Co. v. Carter*, No. 10–309–JJB–SCR, 2010 WL 4135202, at *1 (M.D. La. Oct. 19, 2010). However, here, Cooper has only taken steps to cease its infringing conduct, but has not actually done so. Indeed, Cooper's actions come months after ignoring a jury verdict against it. Furthermore, at oral argument, Cooper indicated that, while it was developing a new color scheme, it would prefer to keep using the yellow and black color scheme. Given Cooper's disregard of the jury verdict to date, the Court is not at all convinced that Cooper would not revert to its original color scheme if it was unhappy with the red and black color scheme.

As discussed previously, the evidence can sustain the jury's finding of willfulness. *See supra* Part II.B.2. However, as noted *supra* Part II.B.2, Cooper also presented evidence that it merely combined two functional features with desirable benefits. While the Court need not, on the basis of this evidence, grant judgment as a matter of law on the question of willfulness, Cooper's evidence is sufficient to convince this Court that this is not a clear case of willful infringement. *See infra* Part VII.B. As such, the Court declines to use its discretion in a manner that does not balance the equities. *Cf. Marine Shale Processors*, 81 F.3d at 1358–59 (recognizing that in cases where a defendant's conduct was willful, a court was not *required* to balance the equities). Balancing the equities, however, poses little difficulty in this instance.

Cooper has already been working on a new color scheme for several months, and will not have difficulty transitioning.  Finally, enjoining continued trade dress infringement is in the public interest.  *See Quantum Fitness*, 83 F. Supp. 2d at 832; *T-Mobile*, 2009 WL 2003369, at *4.

The factors support a permanent injunction enjoining Cooper from continued use of the infringing black and yellow color scheme.  However, Clearline is not entitled to the broad injunction it seeks barring Cooper from using any black and yellow color scheme.  While the facts support a conclusion that the particular combination of black and yellow was not functional and likely to cause confusion, *see supra* Part II.B.1.a–b, the jury verdict cannot, and should not, be interpreted to mean that all black and yellow color schemes are off-limits.  After all, the jury found the yellow reflective striping used by Cooper functional and not likely to cause confusion, and the record contains evidence that the black color was functional.  (Doc. No. 151 at 2, 4; Trial Tr. 849:8–851:6.)  It is entirely possible that another combination of these features would be either functional or not likely to cause confusion.  Accordingly, Cooper is immediately and permanently enjoined from using the particular black and yellow color scheme it has been using on its DURA-BLOKs™, and any other black and yellow color scheme that would be confusingly similar to the black and yellow color scheme Clearline has been using on its C-PORTs®.

In contrast, the record does not warrant permanently enjoining Cooper from using the C-PORT® mark.  The evidence showed that Cooper had recognized the need to remove the C-PORT® mark from its internet code and tradeshow catalogues, and taken steps to do so, well before the jury verdict, although it had clearly missed some references.  (*See, e.g.*, Trial Tr. 806:4–809:22, 899:25–900:9, 933:19–935:14, 1174:17–1175:11.)  Cooper represented, at oral argument, that it no longer retained any references to the C-PORT® mark in its internet code or its tradeshow catalogues.  Clearline agreed that it was not aware of any continuing infringement

of its trademark.  In circumstances like these, where the infringement may well have been inadvertent and recurrence is unlikely, an injunction is not warranted.  *See, e.g.*, *Schutt*, 673 F.2d at 207; *Circuit Breaker Litig.*, 860 F. Supp. at 1456.

## VII.   ATTORNEYS' FEES

### A.   Legal Standard

Clearline seeks attorneys' fees under the Lanham Act.  "The court in exceptional cases may award reasonable attorney fees to the prevailing party."  15 U.S.C. § 1117(a).  "The prevailing party has the burden to demonstrate the exceptional nature of a case by clear and convincing evidence."  *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1390 (5th Cir. 1996) (citing *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60, 65 (5th Cir. 1992)). "An exceptional case is one where the violative acts can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'"  *Id.* (citing *Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 491 (5th Cir. 1992)); *see also Taco Cabana*, 932 F.2d at 1127.  The Fifth Circuit has recognized that many courts "require a showing of a high degree of culpability on the part of the infringer, for example, bad faith or fraud," before a case can be found exceptional.  *Seven-Up*, 86 F.3d at 1390 (citing *Tex. Pig Stands, Inc. v. Hard Rock Café Int'l*, 951 F.2d 684, 696–97 & n. 25 (5th Cir. 1992); *Moore*, 960 F.2d at 491 & n.2.).  It is not clear whether the Fifth Circuit has itself adopted such a requirement.  *Compare Moore*, 960 F.2d at 492 (applying the standard requiring a high degree of culpability, such as bad faith or fraud) *with Tex. Pig Stands*, 951 F.2d at 697 n.25 (declining to draw a "bright line" requiring that a case involve "very egregious conduct" before it can be deemed exceptional).  It is clear, however, that "[a] jury finding of willfulness does not bind the trial court in determining whether [a] case is 'exceptional.'"  *Tex. Pig Stands*, 951 F.2d at 697.  Furthermore, deliberate copying will likewise not render a case *per se* exceptional.  *CJC*

*Holdings*, 979 F.2d at 65.  In fact, "[a] district court normally should not find a case exceptional where the party presents what it in good faith believes may be a legitimate defense."  *Id.* at 66 (citation omitted).

Clearline also moves for attorneys' fees under the Illinois Uniform Deceptive Trade Practices Act ("DTPA").  The standard for liability under the DTPA is the same as that under the Lanham Act.  *Tarin v. Pellonari*, 625 N.E.2d 739, 745–46 (Ill. Ct. App. 1993).  The DTPA provides that "[c]osts or attorneys' fees or both may be assessed against a defendant only if the court finds that he has willfully engaged in a deceptive trade practice."  815 Ill. Comp. Stat. 510/3.  "[A]ttorneys' fees are awarded to the prevailing party under the DTPA under a similar analysis as the Lanham Act."  *Neuros Co., Ltd. V. KTrubo, Inc.*, No. 08–cv–5939, 2013 WL 1706368, at *4 (N.D. Ill. April 17, 2013).

## B.    Analysis

Clearline argues that it is entitled to attorneys' fees under the Lanham Act or, in the alternative, under the DTPA because this case is exceptional, pointing to the jury's finding of willfulness.  It requests approximately $1.5 million in attorneys' fees.  Cooper argues that attorneys' fees are inappropriate because Clearline should not be the prevailing party for the reasons argued in Cooper's JMOL.  These arguments have been thoroughly addressed.  *See supra* Part II.B.  Cooper next argues that this case is not exceptional because Cooper merely copied functional features, and this case does not involve the high level of culpability generally found in cases where attorneys' fees are awarded.  It also argues that Clearline's proof of fees is inadequate.

The Court agrees with Cooper that this case is not exceptional.  Although the jury was presented with sufficient evidence to conclude that that the infringement was willful by a

preponderance standard, *see supra* Part II.B.2, the Court does not find that Cooper infringed willfully by a clear and convincing standard.  *Seven-Up*, 86 F.3d at 1390.  The record also contains a significant amount of evidence that the black recycled rubber and the yellow color were each selected for their functional benefits.  *See supra* Part II.B.2.  This evidence suggests that Cooper may have infringed on a nonfunctional combination of these functional features unintentionally, out of a desire to obtain the benefits of the individual functional features. Although the Court does not find indefensible the jury's determination that Cooper's infringement under a preponderance standard, it does believe that, at most, there was only enough evidence to support a finding of willfulness by a preponderance, and not by clear and convincing evidence.

Furthermore, the Court does not agree with Clearline that this is a case of bad faith and "brazen imitation."  *Taco Cabana*, 932 F.2d at 1128.  Unlike *Taco Cabana*, which involved infringement of the trade dress a plaintiff had in the appearance of a chain of Mexican restaurants, this case involves a combination of features that, independently, are likely functional.  Cooper may well have copied Clearline's trade dress because it, in good faith, believed there was nothing protectable about it.  While the jury ultimately concluded that the combination was protectable, Cooper has surely presented "what it in good faith believe[d] [to] be a legitimate defense."  *CJC Holdings*, 979 F.2d at 66.

Based on the foregoing, the Court concludes this is not an exceptional case.  Accordingly, Clearline's request for attorneys' fees under the Lanham Act is denied.  Because attorneys' fees are provided under the DTPA under a similar analysis as the Lanham Act, and because the Illinois statute similarly vests this Court with discretion to award or not award fees even in cases

41

of willful infringement, the Court also declines to award fees in this case under the DTPA.  *See*

815 Ill. Comp. Stat. 510/3; *Neuros*, 2013 WL 1706368, at *4.

## VIII.  CONCLUSION

For the reasons discussed above, the Court holds as follows:

1)  Clearline's Motion for Pleading Amendment (Doc. No. 159) is **DENIED**;

2)  Cooper's Renewed Motion for JMOL (Doc. No. 161) is **DENIED**;

3)  Clearline's Renewed Motion for JMOL (Doc. No. 160) is **DENIED**;

4)  Clearline's Motion for Enhanced Damages (Doc. No. 156) is **DENIED**;

5)  Clearline's Motion for Supplemental Actual and Enhanced Damages (Doc. No. 184) is **GRANTED IN PART AND DENIED IN PART WITHOUT PREJUDICE TO REFILING** as follows:

   - an award of supplemental damages is appropriate;

   - Cooper must produce to Clearline, within fifteen days, its post-verdict sales figures of DURA-BLOKs™;

   - parties are to engage in any necessary discovery and negotiate an appropriate amount of supplemental damages;

   - in the event parties cannot reach an agreement on supplemental damages, Clearline should re-file its Motion for Supplemental Damages within forty-five days;

6)  Clearline's Motion for Award of Interest (Doc. No. 155) is **GRANTED IN PART AND DENIED IN PART** as follows:

   - pre-judgment interest will be awarded in the amount of the average prime rate from May 2008 until the date judgment is entered;

   - pre-judgment interest will be compounded annually;

   - once supplemental damages are resolved, parties will submit an agreed proposal detailing the prime rate during relevant time period based on data published by the Federal Reserve and calculating the dollar amount of pre-judgment interest Clearline is owed;

   - Clearline will be awarded post-judgment interest at the weekly average 1-year constant maturity Treasury yield for the calendar week preceding the date of judgment;

7) Clearline's Motion for Permanent Injunction (Doc. No. 157) is **GRANTED IN PART AND DENIED IN PART** as follows:

- Cooper is immediately and permanently enjoined from using the black and yellow color scheme it has been using on its DURA-BLOKs™, and any other black and yellow color scheme that would be confusingly similar to the black and yellow color scheme Clearline has been using on its C-PORTs®;

- No permanent injunction shall issue with respect to Clearline's trademark infringement claims; and

8) Clearline's Motion for Attorney's Fees and Costs (Doc. Nos. 158) is **DENIED**.


**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 3rd day of June, 2013.


_____

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE